OLGA VAN DEUSEN ET AL., Respondents, v. J. F. RUTH ET AL., Defendants, LEO J. BUSSMANN, Appellant.—125 S. W. (2d) 1.

Division Two, February 21, 1939.

*David E. Horn* and *Alfred L. Grattendick* for appellant.

*Jacob M. Lashly, Walter Wehrle* and *John O. Hichew* for respondents.

WESTHUES, C.—This, a suit in equity, was filed by plaintiffs, respondents here, in the Circuit Court of St. Louis County, seeking the cancellation of an instrument designated as a ''Modification and Amendment of Restrictions in Davis Place.'' The trial court granted

plaintiff the relief prayed for and the defendant, Leo J. Bussmann, appealed.

Davis Place, a real estate subdivision, is located in Clayton, St. Louis County, Missouri. It is bounded on the north by the Chicago, Rock Island & Pacific Railroad tracks, on the south by Clayton Road, on the west by North and South Road and on the east by Hanley Road and Polo Drive. Davis Place was laid out and platted by the Eighty Hundred Realty Company. Restrictions were placed on the property prohibiting the building of apartment houses, stores, flats or other commercial buildings except on lots fronting on Clayton and North and South Roads. Lots fronting on Hanley Road were available for apartments. The agreement providing for the restrictions, dated June 5, 1925, contained the following:

"All or any of the foregoing provisions or restrictions may be modified, amended, released or extinguished at any time after ten (10) years by written instrument executed, acknowledged and recorded as required by law for instruments affecting real estate, by the owners of seventy-five per cent (75%) of the total number of front feet embraced in this indenture, and for this purpose the frontage shall be determined as set forth in Paragraph Second of this instrument, provided, however, that the Company, its successors or assigns promoting this subdivision, or its or their assigns who shall not be bona fide purchasers of lots therein, shall not be privileged to join in such written instrument."

The alleged modification agreement, sought to be canceled by this suit, was dated May 8, 1936. By this modification it was agreed in substance to prohibit the erection of any apartment or building for commercial purposes on lots fronting on Hanley, Clayton and North and South Roads as permitted in the original agreement. Plaintiffs brought this suit on behalf of themselves and other lot owners of this subdivision. Plaintiffs, by their petition and at the trial, presented two theories, either of which they contended was sufficient to avoid the alleged modification agreement. First, it was contended that by the so-called modification agreement additional burdens were attempted to be placed on the subdivision; that the original agreement did not authorize this to be done; that the words "modified" and "amended" as used in Article 14, above quoted, cannot be construed to mean and include additional burdens. Second, it was contended that the so-called modification agreement was not signed by owners of property, owning seventy-five per cent of the total number of front feet of the subdivision, who were authorized to sign. The instrument upon its face disclosed that the purported signers owned slightly in excess of seventy-five per cent of the total number of front feet. Appellant, Leo J. Bussmann, signed as owner of more than ten thousand feet. Respondents contend that by Article 14 of

the original agreement he was excluded from signing a modification agreement because he was a successor of the original company promoting the subdivision. The trial court found for plaintiff on both theories.

We are of the opinion that the ruling of the trial court was correct. Note the language of the provision authorizing a change in the restrictions: "All or any of the foregoing provisions or restrictions may be modified, amended, released or extinguished at any time after ten (10) years. . . ." A mere reading of the above suggests to the mind that the intention was to permit the existing restrictions to be alleviated, that is, made less harsh, or to be entirely extinguished. It would certainly require a strained construction to hold that the clause authorized any new and additional restrictions and burdens to be added. The words "modify" and "amended" may have various meanings, but they must be interpreted in the light of the context in which they are used. When so interpreted in this case they cannot be given a meaning which would authorize new burdens to be added. In 40 Corpus Juris, 1487, the following appears:

"Ordinarily, to change the mode in which a subject is dealt with rather than to change the subject itself; sometimes importing an authority to amend; to enlarge; to extend; to substitute. 'Modify' ordinarily is not used in the sense of completely setting aside the thing to be modified. The lexicographers define the term in the sense of limiting or reducing the thing to be modified in extent or degree. A power to modify implies the existence of the subject matter to be modified. The word implies no power to create or to bring into existence, but only the power to change or vary in some particular an already created or legally existing thing. The power to modify anything does not imply a power to substitute a thing entirely different."

In the notes we read:

" 'Modification' is not exactly synonymous with 'amendment,' for the former term denotes some minor changes in the substance of the thing, without reference to its improvement or deterioration thereby, while the latter word imports an amelioration of the thing (as by changing the phraseology of an instrument, so as to make it more distinct or specific) without involving the idea of any change in substance or essence. Black L. D."

■ Appellant concedes that restrictive covenants upon land are to be strictly construed. That has been the policy of the law. See Gardner v. Maffitt, 335 Mo. 959, 74 S. W. (2d) 604, l. c. 607 (4-6), where this court said:

"Restrictions, being in derogation of the fee conveyed, will not be extended by implication to include anything not clearly expressed."

To uphold the so called modification agreement in this case we would be compelled to construe the clause under discussion most liberally in order to authorize new restrictions to be fostered upon the subdivision. This would mean overturning the above principle of law, conceded by appellant to be in force in this State as well as other jurisdictions.

It seems clear to us that appellant was excluded from signing any modification agreement. The Eighty Hundred Realty Company on April 23, 1931, borrowed from the Bussmann Investment Company, a corporation, the sum of $290,000. It executed a deed of trust on all of the unsold lots in Davis Place as security on this loan. In May, 1931, a second deed of trust was executed to the investment company for a loan of $13,125. Leo J. Bussmann and his brothers were the stockholders in the investment company. In February, 1932, the second deed of trust was foreclosed and a Mr. Delporte, an attorney, became the purchaser. About a year later the Hanclay Realty Company, a corporation, was formed and the property transferred to this company. While Delporte held the title he entered into a sales agency contract with Shaw-Francis, granting to them the exclusive agency for the sale of lots in Davis Place. December 21, 1935, the Hanclay Realty Company, by deed, transferred all of the unsold lots to Leo J. Bussmann. The evidence showed that he took title for himself and his brothers. The evidence also disclosed beyond doubt that from the time of the foreclosure sale in February, 1932, to the time of the trial the Bussmann brothers directed and controlled all of the negotiations affecting the property sold under the foreclosure sale. The contract with Shaw-Francis, as sales agents, was continued and was still in force at the time of the trial. During the years following the foreclosure sale the surplus cash derived from the sale of lots was applied as directed by the Bussmann brothers.

The intent expressed in paragraph eight of the original covenant was to prohibit the company, or its successors promoting the subdivision, from signing an agreement to modify the same. Certainly it would make no difference how the successor acquired title, whether at a bankruptcy sale, foreclosure sale or by direct deed. The purpose of the clause was forcefully demonstrated in this case. The evidence showed that appellant, owner of over ten thousand front feet of property, was the prime mover in obtaining signatures to the modification agreement. If the property of Bussmann is not to be considered in ascertaining the number of front feet, as owned by signers of the modification agreement, then it is void because it is not signed by owners of seventy-five per cent of front feet. Appellant in his brief contends that he was not a successor to the Eighty Hundred Realty Company, citing Thompson v. North Texas Natl. Bank, 37 S. W. (2d) 735; Mississippi Valley Trust Co. v. Southern

Trust Co. (C. C. A. Ark.), 261 Fed. 765; Hanna v. Florence Iron Co. of Wisconsin, 222 N. Y. 290, 118 N. E. 629. In the Mississippi Valley Trust Company case a railroad company had secured a debt by giving a mortgage on its property. The mortgage recited that it covered all of the existing property and all thereafter acquired by the company or its successors. Later another railroad company purchased all of the property of the mortgagor and assumed the payment of the debt secured by the mortgage. The court held that the purchasing company was not a successor in the sense that the mortgagee acquired a lien on the property of the buying company. In Hanna v. Florence Iron Company of Wisconsin, a Mr. Kellogg guaranteed the payment of steel to be delivered under the contract to a certain company, its successors and assigns. The company went into involuntary receivership. The court held that the guarantor was not liable for steel delivered to the receivers because it held the receivers were not successors or assigns of the company but merely custodians of the property by order of court. The above cases are easily distinguishable from the case at bar and are not authority for appellant's position. In the case of Thompson v. North Texas National Bank, Thompson and others guaranteed the payment of any indebtedness, not to exceed $20,000, of the Texas Mortgage Company to the Southern National Bank, its successors or assigns. The bank assigned all of its assets, including the contract of guarantee, to the North Texas National Bank. The bank sued Thompson et al., on a debt due the southern bank by the mortgage company. The court held that the assignee came within the terms expressed in the guarantee and declared that the North Texas Bank was a successor. The court in the course of the opinion said:

"From the discussion it is evident that the general meaning of the word 'successor' is defined by Webster, supra. However, the exact meaning as applied to a contract wherein the word is used must depend largely on the kind and character of the contract, its purposes and circumstances, and the context."

In the case at bar Bussmann was a successor in all respects to the Eighty Hundred Realty Company. Bussmann was entitled to the benefits of the contract providing for the restrictions. Lots could be sold with the assurance that the restrictions, as contained in the contract, would remain in force until modified by the purchasers of lots in the subdivision, and that the company or the successor promoting the subdivision would not be a party to this modification. The promoters had agreed that they would not pool their property, which was a large frontage, in support of the modification of the restrictions. That clause in the contract applied to Bussmann. Appellant also urged that he was a bona fide purchaser. Certainly Bussmann was a bona fide purchaser in a certain sense because he was

compelled to take the property to save his investment. He did not, however, buy the property in the subdivision for his own personal use. We are not concerned with that, however, because appellant came within the first designation of those who were ineligible to sign a modification agreement, that is, "the company its successors or assigns promoting this subdivision." The second part of this clause, "or its or their assigns who shall not be bona fide purchasers of lots therein" would include purchasers of lots, who perhaps had taken title under an agreement with the promoters for the express purpose of signing a modification agreement for the promoters and not with the intent of personally making use of the lots.

Again, appellant asserts that he was not promoting the subdivision in question, that is, Davis Place. If the Eighty Hundred Realty Company was promoting Davis Place, of which there can be no doubt, then appellant was likewise doing so. He was carrying on where the realty company had ceased. It may be stated here that the realty company went into receivership. Appellant was under contract with Shaw-Francis as a sales agency in the business of selling lots. He owned all of the lots that remained unsold by the original promoters. The very act of appellant in attempting to place additional restrictions upon the subdivision was in furtherance of promoting the sale of lots. Appellant in every respect was standing in the shoes of the Eighty Hundred Realty Company. The trial court correctly ruled the question and the judgment is affirmed. *Cooley* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.