

# SUPREME COURT OF MISSOURI
## en banc

TRUSTEES OF CLAYTON )    *Opinion issued August 13, 2019*
TERRACE SUBDIVISION, )
                         )
    Respondent/Cross-Appellant, )
                         )
v. )    No. SC97349
                         )
6 CLAYTON TERRACE, LLC, )
                         )
and )
                         )
JEANNETTE R. HUEY, TRUSTEE )
OF THE JANE R. HUEY LIFETIME )
TRUST AGREEMENT DATED )
MAY 21, 1998, )
                         )
    Appellants/Cross-Respondents. )

**Appeal from the Circuit Court of St. Louis County**
**The Honorable Dale Hood, Judge**

Jeannette R. Huey, 6 Clayton Terrace, LLC, and the Trustees of Clayton Terrace Subdivision ("trustees") appeal from portions of the circuit court's judgment not in their favor. This Court affirms the portion of the circuit court's judgment upholding Ms. Huey's sale of her home located in the Clayton Terrace subdivision despite allegations she failed to comply with the right of first refusal contained in the subdivision indentures. But this Court reverses the portion of the circuit court's judgment holding the

trustees' attempt to have the sale set aside constituted an abuse of process and awarding attorney's fees to Ms. Huey on that claim. An abuse of process claim requires more than the proof Ms. Huey offered that the trustees' purpose was allegedly improper. She also failed to show the trustees made an improper use of process.

This Court affirms the circuit court's refusal to reject the amended indenture provision prohibiting the building of more than one residence per lot. That provision could not be avoided by attempting to divide the lot into two sub-lots. But the circuit court erred in awarding attorney's fees to the trustees against 6 Clayton Terrace on the basis the latter's failure to reveal its subdivision plan constituted "special circumstances" justifying the award of attorney's fees for intentional misconduct. Assuming attorney's fees could be awarded where, as here, the trustees did not seek declaratory relief against 6 Clayton Terrace, the trustees fail to identify any basis on which 6 Clayton Terrace, as an arms' length purchaser, had a duty to reveal its planned use of the property. Further, the fact 6 Clayton Terrace ultimately lost its claim does not create "special circumstances" for purposes of attorney's fees, as one party loses every claim.

## I.    *FACTUAL AND PROCEDURAL BACKGROUND*

Jane Huey lived in a home on a 2.3-acre piece of property referred to as Lot 6 in a subdivision called Clayton Terrace in Frontenac, Missouri. Clayton Terrace was established by plat in 1923, at which time it had 23 recorded lots.[1] The subdivision is subject to the original indentures, which are handwritten and recorded on the same

---

[1] Portions of certain lots were later taken for a highway access ramp, and the remaining lots were reconfigured into 22 lots.

2

document that contains the plat. The original indentures provide the restrictions will be "in force and binding upon the owners of this Subdivision for a period of 25 years from date of this instrument, unless amended or extended by two-thirds of the lot owners in this Subdivision and publicly recorded."

The original indentures have been amended or extended approximately five times. There are two relevant indenture amendments and extensions. One was approved in 1928, providing that "only one residence shall be erected on each lot." In 1972, a "right of first refusal" provision was approved under which any lot owner selling a lot was required to provide "15 days' written notice to the owners of all other lots in the subdivision … such notice to contain the selling price and other terms of the proposed sale and to whom it is made." The 1972 provision grants the other lot owners "the right to elect in writing to purchase said lot on the same terms (including the closing date) as offered to the third party buyer …." Both the "one residence per lot" provision and "right of first refusal" provision were restated in the most recent amendment and extension, which was recorded in 1998 and approved by two-thirds of the lot owners. The indentures also provide for the election of subdivision trustees. The indentures impose a fiduciary duty on the trustees to the lot owners and provide "the Trustees shall have the power to enforce the restrictions spread upon the plat of Clayton Terrace subdivision."

Jane Huey died October 15, 2011. Her daughter, Jeannette Huey, as trustee of her mother's trust, became responsible for Lot 6. Ms. Huey listed Lot 6 with a real estate agent in September 2012. A career real estate developer, Kevin McGowan, testified at trial that, "as soon as I saw it, when I noticed it was almost three acres, my very first

thought was that this might be able to be split." Before making an offer, he confirmed with Frontenac that its municipal ordinances would not prohibit subdivision of the property. To purchase the property, he secured an investor, Century Renovations, LLC, and both he and the investor reviewed the Clayton Terrace indentures. In January 2013, Ms. Huey and Century Renovations agreed to terms for the sale of Lot 6 and set the closing for February 2013.

As the sale was pending, Insight Title Company, LLC, on behalf of Ms. Huey, reached out to the trustees concerning the sale. The trustees advised Insight Title of the "right of first refusal" provision. Insight Title prepared a notice of sale for the property and the real estate agent hand-delivered notice to Clayton Terrace lot owners of the proposed sale 15 days before the closing date. Whether all lot owners were given this notice later became the subject of dispute. The notice of sale did not contain the identity of the proposed purchaser.

Only one homeowner returned her notice of sale indicating she might be interested in acquiring the property. Her request to walk through the property was denied. Ultimately, that homeowner delivered a written document expressly waiving her right of first refusal and later confirmed she did not want to buy the property. The day before closing, and after the notices had gone out, Century Renovations assigned the sale contract to an entirely new entity, 6 Clayton Terrace. 6 Clayton Terrace is a limited liability company owned by Century Renovations.

On February 15, 2013, Ms. Huey sold Lot 6 to 6 Clayton Terrace. The proceeds from the sale of Lot 6 went into Jane Huey's trust. Believing the sale of the property to

4

be final, Ms. Huey disbursed its proceeds to the trust beneficiaries in April 2014. As part of the sale, Insight Title tendered the outstanding homeowners' association fees to the trustees of Clayton Terrace. The trustees deposited these funds in the subdivision account. Following the sale of the lot to 6 Clayton Terrace, Mr. McGowan leased the home and moved in with his children. He began substantial renovations that would have been evident to those passing or living near the home, including renovating the pool and deck, removing multiple trees and significant brush, knocking out walls within the residence, and cutting holes in the exterior walls to add more doors.

In the meantime, 6 Clayton Terrace began attempting to obtain approval from the Frontenac planning and zoning commission to split the 2.3 acres into two lots. No formal notice of this plan was given to the Clayton Terrace trustees, although 6 Clayton Terrace presented evidence Mr. McGowan's nine-year-old son informally told a Clayton Terrace resident about the plan shortly after closing, and that resident informed one or more trustees. The trustees were concerned about the idea of having the lot subdivided but had received no direct notice of an intent to subdivide and they did not approach the owners or those living in the home about the rumor the lot would be subdivided.

The following spring, in April 2014, 6 Clayton Terrace filed an application with Frontenac to subdivide Lot 6 into two lots, to be known as Lots 6A and 6B. The trustees and several of the Clayton Terrace residents strongly opposed 6 Clayton Terrace's proposal and appeared at public meetings to voice their opposition. Frontenac advised the trustees it was bound only by its own municipal ordinances, which simply required that each lot be greater than one acre in size, and it had no authority to enforce private

5

indentures. In June 2014, Frontenac approved 6 Clayton Terrace's application as it did not violate city ordinances.

Two months later, in August 2014, the trustees sued both Ms. Huey and 6 Clayton Terrace. Count I sought a declaratory judgment against Ms. Huey, claiming she violated the amended indentures by failing to provide sufficient written notice to all the subdivision lot owners and failing to accept one lot owner's offer to purchase Lot 6. In support, the trustees asserted the hand-delivered notice did not show the property was being purchased by a developer rather than a family, gave an incorrect closing date, and one or more Clayton Terrace owners were not given the notice.

In count II the trustees sought injunctive relief against 6 Clayton Terrace to prohibit it from subdividing the lot and constructing an additional home on Lot 6, claiming division of Lot 6 into two sub-lots would violate the restrictions in the amended indentures. The trustees also sought attorney's fees. Both 6 Clayton Terrace and Ms. Huey denied these claims and asserted affirmative defenses, including that the trustees had waived and ratified the purchase by waiting more than one year to challenge the sale and alleging the amendments to the original indentures were invalid because they were adopted without the unanimous consent of all lot owners. Ms. Huey also filed a counterclaim against the trustees for abuse of process, based on her contention the trustees filed count I against her for the sole and allegedly improper purpose of preventing 6 Clayton Terrace from constructing another residence on Lot 6.

Prior to trial, the parties submitted stipulated facts and exhibits. In December 2016, the circuit court entered judgment in favor of Ms. Huey and against the Clayton

6

Terrace trustees on count I, holding the "right of first refusal" provision was invalid and unenforceable, and in any event equitable considerations and the doctrines of waiver and ratification militated against enforcement of the indentures because the trustees: (1) did not raise any failure to comply for a year and a half after the sale despite their awareness of substantial modifications being made to the property by the new owners; and (2) ratified the sale by accepting funds out of the proceeds of the closing for homeowner association fees.

The circuit court also found in Ms. Huey's favor on her abuse of process counterclaim, finding the trustees' attempts to set aside the sale of the property were done with what it said was the improper purpose of coercing 6 Clayton Terrace into withdrawing its request to subdivide the property by placing its title at risk. The circuit court awarded Ms. Huey attorney's fees.[2]

On count II, the circuit court found in the trustees' favor. Noting the text of the indentures neither expressly prohibited nor expressly allowed for the subdivision of lots, the circuit court looked to the various provisions of the indentures and concluded the limitation of one house per lot was intended to preclude subdivision of the lots. It enjoined 6 Clayton Terrace from subdividing Lot 6 or constructing an additional residence on Lot 6 and awarded the trustees' their costs. Finding that 6 Clayton Terrace had acted in bad faith in failing to reveal its plan to subdivide the property and that this

---

[2] Puzzlingly, the court found Ms. Huey's fees of $119,243 to be fair and reasonable but awarded her only $60,000 in attorney's fees. Of the $60,000 awarded, $20,000 was against the trustees and the other $40,000 was against 6 Clayton Terrace, which brought no claim against Ms. Huey and against whom she claimed no abuse of process.

7

constituted "special circumstances," it included substantial attorney's fees in its judgment against 6 Clayton Terrace.[3] All parties appealed. After an opinion by the court of appeals, this Court granted transfer. *Mo. Const. art. V, sec. 10.*

## II. STANDARD OF REVIEW

"The trial court's judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Robinson v. Title Lenders, Inc., 364 S.W.3d 505, 510 (Mo. banc 2012).* "The circuit court's determinations of questions of law are subject to *de novo* review." *Hill v. Mo. Dep't of Conservation, 550 S.W.3d 463, 467 (Mo. banc 2018).*

## III. THE CIRCUIT COURT'S FINDING THAT THE SALE OF LOT 6 WAS VALID IS NOT AGAINST THE WEIGHT OF THE EVIDENCE

The trustees contend the circuit court's ruling that Ms. Huey's sale of Lot 6 was valid because she complied with the "right of first refusal" provision was against the

---

[3] The judgment set out the court's reasoning in detail:

> Accordingly, the Court looks to the four corners of the document for guidance. The Fifth Revised Indentures continue the restriction that "only one residence shall be erected on each lot". The Fifth Revised Indentures also provide that "if more than one lot owner elects to purchase said lot, then all lot owners electing to purchase said lot shall do so on a pro rata basis." Such provision indicates a preference for ownership of undivided lots as opposed to division of the lots to separate owners. In addition, the Fifth Amended Indentures provide that: "No building or other structure shall be erected closer than 15 feet to any side of rear lot line provided, however, that one residence may be erected on two adjoining lots in which and every such event such two lots shall for all purposes of the foregoing restrictions be deemed one lot." Thus, the indentures indicate preference for consolidation rather than subdivision of Lots. This Court is unable to locate any provisions in the indentures providing for subdivision of lots under any circumstances.

8

weight of the evidence.[4]  That provision required she provide at least 15 days' notice to each lot owner, and that such notice contain the selling price and "other terms."  Because the circuit court reasonably could have found from the record that she complied with the "right of first refusal" provision, that finding was not against the weight of the evidence.

"Appellate courts act with caution in exercising the power to set aside a decree or judgment on the ground that it is against the weight of the evidence."  *Ivie v. Smith, 439 S.W.3d 189, 205 (Mo. banc 2014)*.  "When reviewing the record in an against-the-weight-of-the-evidence challenge, this Court defers to the circuit court's findings of fact when the factual issues are contested and when the facts as found by the circuit court depend on credibility determinations."  *Id*. *at 206.*  "A circuit court's judgment is against the weight of the evidence only if the circuit court could not have reasonably found, from the record at trial, the existence of a fact that is necessary to sustain the judgment."  *Id.*

The circuit court found notice of the sale for Lot 6 was prepared by Insight Title and that the real estate agent hand delivered the notices to each home in Clayton Terrace.  After delivering the notices, Insight Title postponed the closing date of the sale for 15 days to accommodate the 15-day requirement contained in the "right of first refusal" provision.  The circuit court found the majority of homeowners filled out and returned these written waivers, which said the homeowner was not interested in purchasing Lot 6.  Further, none of the witnesses called by the trustees testified they did not receive notice of the sale or currently desired to purchase Lot 6.  The only homeowner who had

---

[4] The trustees also contend the sale was void if the indentures were not substantially complied with, but because the Court affirms the ruling that the indenture provisions

9

indicated an interest in buying Lot 6 did receive notice and later delivered a written document expressly waiving her right of first refusal. Based on this evidence, the circuit court found that Insight Title complied with the indenture.

While the trustees note they presented substantial evidence certain lot owners did not receive the notice, Ms. Huey presented evidence she had delivered the notice to all homes. The circuit court clearly found that more credible. The circuit court "is free to believe all, some, or none of the evidence offered to prove a contested fact, and the appellate court will not re-find facts based on credibility determinations through its own perspective." *Id.* As the circuit court could reasonably have found Ms. Huey complied with the "right of first refusal" provision from facts in the record, this Court rejects the trustees' argument that the circuit court's ruling was against the weight of the evidence.

## IV. CLAYTON TERRACE TRUSTEES DID NOT ABUSE PROCESS IN SUING TO INVALIDATE THE SALE OF LOT 6

While Ms. Huey's sale of Lot 6 is affirmed, this Court reverses the circuit court's finding that there was an abuse of process by the trustees in seeking to have the sale invalidated. "The general rule is that no right of action exists for damages resulting from the initiation of a civil action, unless the action was prosecuted maliciously and without probable cause or there was an abuse of process." *Dillard Dep't Stores, Inc., v. Muegler, 775 S.W.2d 179, 183 (Mo. App. 1989).* To prevail on her abuse of process claim, Ms. Huey was required to show three elements: "(1) the present defendant made an illegal, improper, perverted use of process, a use neither warranted nor authorized by the process;

were not violated, this Court need not address the effect of non-compliance on the sale.

10

(2) the defendant had an improper purpose in exercising such illegal, perverted or improper use of process; and (3) damage resulted." *Ritterbusch v. Holt, 789 S.W.2d 491, 493 (Mo. banc 1990), citing Stafford v. Muster, 582 S.W.2d 670, 678 (Mo. banc 1979).*

Ms. Huey's abuse of process counterclaim asserted the trustees' purpose in seeking to set aside the sale was wholly pretextual and was brought solely for the allegedly improper collateral purpose of coercing 6 Clayton Terrace into abandoning or withdrawing its request to subdivide the property. The circuit court discussed the evidence in detail and concluded Ms. Huey had proved the second element by showing the trustees' purpose was an improper one in that they did not actually care about the alleged improprieties in the notice given by Ms. Huey nor did they identify an owner who wanted to utilize the right of first refusal. The circuit court further found the third element – damage resulted.

Ms. Huey, however, also was required to adduce evidence of the first element, "an illegal, improper, perverted use of process, a use neither warranted nor authorized by the process." *Id.* To support this element, she and the circuit court relied on the same evidence used to support the second element – improper motive. That was error. The test for liability in an abuse of process claim is "whether the process has been used to accomplish some unlawful end, or to compel the defendant to do some collateral thing which he could not legally be compelled to do." *Moffett v. Commerce Trust Co., 283 S.W.2d 591, 600 (Mo. 1955)* (quotations omitted). "The ulterior motive may be inferred from the wrongful use made of the process, but the use itself may not be inferred from the motive." *Id. at 599* (quotations omitted). It is improper to conflate these two separate

11

elements by inferring an improper use of process from bad motive. *Id.*

The test employed to see whether there has been a misuse of process "is whether process had been used to accomplish some unlawful end or to compel the opposite party to do some collateral thing which he [or she] could not be compelled to do legally." *Ritterbusch, 789 S.W.2d at 493 n.1, citing, Owen v. Owen, 642 S.W.2d 410, 414 (Mo. App. 1982).* Courts have found misuse of legal process when a party "employs legal process in a manner technically correct, but for a wrongful and malicious purpose to attain an unjustifiable end or an object" that the particular process is not meant to effectuate. *Montgomery GMC Trucks, Inc. v. Nunn, 657 S.W.2d 334, 336 (Mo. App. 1983)* (quotations omitted).

But "[n]o liability attaches where a party has done nothing more than pursue the lawsuit to its authorized conclusion regardless of how evil a motive he possessed at the time." *Pipefitters Health & Welfare Trust v. Waldo R., Inc., 760 S.W.2d 196, 198-99 (Mo. App. 1988).* To the contrary, in the rare cases in which a valid abuse of process claim will lie, there has been evidence the complained-about action was brought "to obtain a result which the process was not intended by law to effect." *Thompson v. Farmers Exch. Bank, 62 S.W.2d 803, 810 (Mo. 1933)* (quotations omitted).[5]

---

[5] For example, *Stafford, 582 S.W.2d at 679*, found improper use of process where a circuit court charged a party in a child custody case with contempt to compel her to answer questions that the other party had no legal right to ask. *Ritterbusch, 789 S.W.2d at 493-94*, found improper use of process where a person filed a complaint in municipal court to criminally charge Ritterbusch with malicious damage of a vehicle but offered to withdraw his complaint if Ritterbusch would pay the alleged claim for damage to the car.

The facts presented here do not show the use of a legal claim to accomplish some end not envisioned by the legal process used. The trustees had the right to sue to enforce the "right of first refusal" provision, as they had a fiduciary duty to the other lot owners, and the indentures themselves provide "the Trustees shall have the power to enforce the restrictions spread upon the plat of Clayton Terrace subdivision." Ms. Huey, as the seller, was the only person against whom that claim could be brought. *See Moffett, 283 S.W.2d at 600* (finding a petition for abuse of process insufficient when it was "based on allegations of wrongful motives … but shows a state of facts under which it was defendant's duty to have the matters in issue determined"). Most importantly, the claim – a declaratory judgment to establish a transfer of property was void or voidable due to failure to comply with indentures – was brought with the goal of setting aside the sale of property to the developer and is a purpose for which that cause of action is designed.

The circuit court inferred improper use of process by the trustees from their admissions that they chose to pursue their right to enforce the indentures only because they did not like what the purchaser was going to do with the property and from their failure to object timelier to that use or to the alleged indenture violations. But that did not make their use of the process itself either unwarranted, illegal or perverted. The trustees' actions may have been strategic, caused stress and concern to Ms. Huey, and, ultimately, failed, but they were not an unauthorized use of a declaratory judgment. "Abuse of process is not appropriate where the action is confined to its regular function even if the plaintiff had an ulterior motive in bringing the action, or if the plaintiff knowingly brought the suit upon an unfounded claim." *Misischia v. St. John's Mercy Med. Ctr., 30*

13

*S.W.3d 848, 862 (Mo. App. 2000), abrogated on other grounds by Ellison v. Fry, 437 S.W.3d 762, 770 (Mo. banc 2014)*. Whether they won or lost on the "right of first refusal" provision, and regardless of their primary motive for seeking to enforce the indentures they were charged with following, the trustees cannot be found to have abused process when they used the process in the manner intended.[6]

The circuit court's judgment for Ms. Huey on her counterclaim for abuse of process is reversed. Additionally, because the circuit court awarded attorney's fees on her abuse of process claim, the award of attorney's fees is reversed as well.[7]

## V.   THE INDENTURE AMENDMENTS ARE VALID AND ENFORCEABLE AND PROHIBIT SUBDIVISION OF LOTS

6 Clayton Terrace concedes the "one residence per lot" provision is valid if the original indentures permitted the addition of restrictions upon approval of two-thirds of the lot owners. But it argues the original indentures did not expressly permit the addition of restrictions, and, even had they, this provision does not preclude subdividing lots so more residences can be built.

The trustees argue that, to the contrary, the original indentures expressly permit the addition of restrictions to the list of restrictions set out in the original indentures if approved by two-thirds of the lot owners, and the "one residence per lot" restriction

---

[6] This Court notes Ms. Huey did not assert a claim for *prima facie* tort, in which the motivation of the actor is the key element. *See Bandag of Springfield, Inc. v. Bandag, Inc.*, 662 S.W.2d 546, 555-56 (Mo. App. 1983) (plaintiffs unable to prove defendant intentionally sought to injure them by performing an otherwise lawful act, essential to a claim for *prima facie* tort).

[7] Because this Court reverses the attorney's fee award, it need not reach the other issues Ms. Huey raises about the size of the award and any error in apportioning it.

14

cannot be avoided by attempting to subdivide the original lots. This Court agrees with the trustees' interpretation of the indentures.

The original indentures, filed with the plat in 1923, provided, "The following restrictions shall be in force and binding upon the owners of this Subdivision for a period of 25 years from date of this instrument, unless **amended or extended by two-thirds of the lot owners** in this Subdivision and publicly recorded." (Emphasis added). The question before this Court therefore is whether the provision that this list of restrictions may be "amended or extended by two-thirds of the lot owners" provides authority for the addition of restrictions to the indentures and, if so, whether the addition of the "one residence per lot" restriction prohibits subdivision of the lots in the manner attempted by 6 Clayton Terrace.

Contract law provides a simple answer to these questions. "[A] restrictive covenant is a private contractual obligation generally governed by the same rules of construction applicable to any covenant or contract." *Kling v. Taylor-Morley, Inc., 929 S.W.2d 816, 819 (Mo. App. 1996).* Thus, "[t]he principles of contract law apply when interpreting an [i]ndenture." *Arbors at Sugar Creek Homeowners Ass'n v. Jefferson Bank & Tr. Co., 464 S.W.3d 177, 183 (Mo. banc 2015).*

To ascertain the parties' intent, courts give the words of the contract their "natural, ordinary, and common sense meaning." *Wilshire Const. Co. v. Union Elec. Co., 463 S.W.2d 903, 906 (Mo. 1971).* In so doing, the contract's terms "are read as a whole to determine the intention of the parties and are given their plain, ordinary, and usual meaning." *Dunn Indus. Grp., Inc. v. City of Sugar Creek, 112 S.W.3d 421, 428 (Mo.*

15

*banc 2003)*. "Additionally, each term of a contract is construed to avoid rendering other terms meaningless." *Id.*

"[W]hen there is any ambiguity or substantial doubt as to the meaning, restrictive covenants will be read narrowly in favor of the free use of property." *See Blevins v. Barry-Lawrence Cty. Ass'n for Retarded Citizens, 707 S.W.2d 407, 408 (Mo. banc 1986)*. This means if the terms are ambiguous, their meaning "will not be extended by implication to anything not clearly expressed in them." *Andrews v. Metro. Bldg. Co., 163 S.W.2d 1024, 1028 (Mo. 1942)* (quotations omitted).

But "the right of one property owner to the protection of a restrictive covenant is a property right just as inviolable as is the right of another to the free and untrammeled use of his property when unrestricted, and the courts are not commissioned to hunt out a way to defeat such a covenant." *Marose v. Deves, 697 S.W.2d 279, 289 (Mo. App. 1985), citing, Proetz v. Cent. Dist. of Christian & Missionary All., 191 S.W.2d 273, 277 (Mo. App. 1945)*. This means that, "[w]hen a contract is unambiguous, the intent of the contract is discerned solely from the contract's language." *Arbors at Sugar Creek Homeowners, 464 S.W.3d at 183*. Strict construction "should never be applied in such a way as to defeat the plain purpose of the restriction." *Berkley v. Conway P'ship, 708 S.W.2d 225, 227 (Mo. App. 1986)*. "If the intention of the parties to the deed containing the restrictions is clearly expressed the intention controls. All courts profess to give effect to the plain intention of the parties in imposing such restrictions." *Andrews, 163 S.W.2d at 1027* (quotation omitted)*; accord Hall v. Koehler, 148 S.W.2d 489, 494 (Mo. 1941)* ("[W]hen the intention is clear the courts will enforce such restrictions.").

### A. The Original Indentures Permitted the Addition of Restrictions by Two-Thirds of the Lot Owners

As noted above, the Clayton Terrace indentures state "[t]he following restrictions shall be in force and binding upon the owners of this Subdivision for a period of 25 years from date of this instrument, unless amended or extended by two-thirds of the lot owners." "The use of the term 'or' generally refers to alternative possibilities and is akin to use of the word 'either.'" *TAP Pharm. Prods. Inc. v. State Bd. of Pharmacy, 238 S.W.3d 140, 144 (Mo. banc 2007)*. By the indentures' terms, the drafters provided that two-thirds of the lot owners could do two things – amend the list of restrictions that followed and extend those restrictions. To "amend" means "to change or modify in any way for the better." *Webster's Third New International Dictionary 68 (3d ed. 1966)*. This same dictionary defines "extend" to mean "to cause to be longer." *Id. at 804*.

It would be unnatural to read these words other than as expressing an intent that two-thirds of the homeowners could add restrictions to the list provided and could lengthen the time in which the original or added restrictions would be in effect, as both "amend" and "extend" inherently broaden the reach of the list of restrictions either in effect or in time. Indeed, that is how the lot owners have interpreted the indentures up until the current controversy. They amended them in 1928 when, by a more than two-thirds (but not unanimous) vote, they approved an amendment providing, "only one residence shall be erected on each lot." They did so again in adopting amendments over the succeeding decades, adding various restrictions and extending the time of the list of restrictions, by two-thirds vote, most recently in 1998.

17

6 Clayton Terrace argues this Court, nonetheless, must construe the "unless amended or extended" language as insufficiently explicit to have permitted the amendment of the list of restrictions to add a restriction of one residence per lot because *Van Deusen v. Ruth, 125 S.W.2d 1, 3-4 (Mo. 1938)*, held that use of the word "amended" in indentures in that case was insufficiently specific to permit the addition of restrictions without unanimous homeowner approval. *Van Deusen*'s result might have been justified in the context of the particular facts and the unique language of the particular indentures then being interpreted,[8] but its reasoning was suspect.

*Van Deusen* interpreted "amend" in the context of a restrictive covenant to mean an "amelioration of the thing (as by changing the phraseology of an instrument, so as to make it more distinct or specific) without involving the idea of any change in substance or essence[.]" *125 S.W.2d at 1*. This is far from the usual meaning of amend set out above, and violates the settled rule that words in an indenture "are given their plain, ordinary, and usual meaning." *Dunn, 112 S.W.3d at 428*. *Van Deusen*, for this reason, should be limited to its own facts, and has no persuasive – let alone binding – force under the present facts or in cases using different language.

---

[8] The language in *Van Deusen* was not comparable to that in the current case, for there the word "amended" was used with the words "modified … released or extinguished." 125 S.W.2d at 2. *Van Deusen* found that, considered in context, there was an ambiguity as to whether the indentures intended to permit additions to the restrictions listed. *Id. at 2-3*. In particular, as the words "released or extinguished" are words of limitation and could be read in the context of that agreement to imply an intent to permit a narrowing of, but not additions to, the restrictions already set out, it interpreted them strictly not to permit amendments that added to the restrictions listed. *Id.* at 3. There is no such ambiguity in the restrictions at issue in the instant case – they use only the words

18

It is unfortunate, then, that *Van Deusen*'s abnormally limited reading of "amended" has led appellate courts to interpret that word so narrowly as to effectively prohibit almost any amendment to an indenture without unanimous approval. For example, *Jones v. Ladriere, 108 S.W.3d 736, 739-40 (Mo. App. 2003)*, held a restrictive covenant providing restrictions "may be altered, amended, changed, or revoked" by two-thirds majority vote, did not contemplate the addition of new restrictions. Similarly, *Webb v. Mullikin, 142 S.W.3d 822, 827 (Mo. App. 2004)*, held the language "altered or amended all or in part" did not evidence an intent to allow for new restrictions.

One would have thought it not difficult to draft language that would unambiguously permit the addition of restrictions. Yet, more explicit language was drafted, only to itself also be found insufficiently explicit, in *Bumm v. Olde Ivy Development, LLC, 142 S.W.3d 895, 904-05 (Mo. App. 2004)*. In *Bumm,* the indenture provisions expressly stated "[t]hese Protective Covenants may be amended, repealed *or added to* at any time by the owners of a majority of the lots in said addition." *Id. at 897-98* (emphasis added). Yet, relying on *Van Deusen*'s unaccountably narrow definition of the word "amended" and cases applying it, *Bumm* held even the use of the words "added to" was insufficient to permit any additional restrictions. *Id. at 904-05.*

All three of these cases, and others like them, were decided in error based on a misinterpretation and misapplication of *Van Deusen*. The phrases "added to" or "altered or amended" mean just what they say. When a contract unambiguously permits

---

"amended or extended" thereby indicating an intent to allow an increase in the reach of the listed restrictions.

amendment or alteration, there is nothing to construe; the contract may be altered or amended. Unless use of the word amended in the context of a particular set of indentures indicates it is being used in other than its normal and natural sense, then "amended" has its normal meaning – "to change or modify [them] in any way for the better." *Webster's Third New International Dictionary 68 (3d ed. 1966)*.

Applying these principles here, the original indentures (written a decade before *Van Deusen* was decided) permitted the lot owners to both "amend" and "extend" the indentures. Both are words of enlargement, and nothing in the context of the indentures suggests these words were used in other than their normal meaning. The plain language of the original indentures, thereby, gave the power to the homeowners to vote, by two-thirds, to change or modify the list of restrictions in the way they believed was for the better. In 1928, they chose to utilize this power by adding the "one residence per lot" restriction. The addition of a requirement that there be one residence per lot was a permissible amendment of the original indenture providing for 23 lots in the subdivision, and it was approved by two-thirds of the owners as required by the original indenture. This provision is valid and enforceable.

### B. The "One Residence Per Lot" Provision Prevents Lot Subdivision

6 Clayton Terrace also argues that, even if valid, the "one residence per lot" provision does not preclude subdividing Lot 6 into two lots and building one residence on each sub-lot. This Court again disagrees. As the circuit court held, because the "one residence per lot" indenture provision, read in the context of the entire instrument, indicates it was intended to prevent construction of multiple residences per original lot,

this language precludes 6 Clayton Terrace from subdividing Lot 6 into two lots to avoid the "one residence per lot" restriction.

In determining a covenant's plain meaning, "[r]estrictive covenants are examined in the context of the entire instrument and not in just a single clause." *Kauffman v. Roling, 851 S.W.2d 789, 792 (Mo. App. 1993).*

> The cardinal rule of contract interpretation, and thus for the interpretation of a restrictive covenant, is that the party's intentions must be ascertained and given effect. … The parties' intent can be determined by inquir[ing] into the purpose sought to be accomplished by the restrictive covenant. Each contractual provision is construed in harmony with the others to give each provision a reasonable meaning and avoid an interpretation that renders some provisions useless or redundant.

*Blue Ridge Bank & Trust Co. v. Trosen, 221 S.W.3d 451, 459 (Mo. App. W.D. 2007)* (quotations and citations omitted) (alteration in original); *accord Andrews, 163 S.W.2d at 1028* (courts will interpret restriction "in the light of the entire context of the instrument containing the restrictions").

Applying these principles, *Berkley* held a restriction limiting one single family dwelling per lot prevented subdivision of a lot when the covenant provisions also included other restrictive measures, such as specific cubic feet requirements for specifically listed individual lots. *708 S.W.2d at 227-28. Berkley* found the restriction on dwellings combined with the set specification of cubic feet for each specified lot "show[ed] that the original grantor placed the residential restrictions on the individual lots, intending to assure each lot owner that only a limited number of homes would ever be built in the Ingleside Subdivision." *Id. at 228.*

The original Clayton Terrace indentures were created in 1923 as a handwritten

21

paragraph on the plat. The plat had 23 lots. The first amended indentures, codified just five years later in 1928, were also hand-written and meant to accompany that plat. They unambiguously state, "Only one residence shall be erected on each lot." In context, it is evident the term "each lot" necessarily refers to each of the 23 lots on the plat the indentures accompanied and on which the original indenture actually was written. At no point since 1928 has Clayton Terrace had more than 23 houses.[9]

Further, as the circuit court concluded below, similar to *Berkley*, this intent is supported by the inclusion of other indenture provisions restricting what can be done if lots are to be sold or if an owner wants to erect a new house on adjoining lots. For instance, the indentures provide:

> No building or other structure shall be erected closer than 15 feet to any side of rear lot line provided, however, that one residence may be erected on two adjoining lots in which and every such event such two lots shall for all purposes of the foregoing restrictions be deemed one lot.

The separate opinion would hold that this restriction is not comparable to that in *Berkley* because it does not list each lot by number in saying how far from the rear line each structure may be placed. But, as the restriction was the same for all lots, there was no reason to list each lot separately, as had been done in the *Berkley* indenture.[10] Here,

---

[9] Since its founding, Clayton Terrace has rearranged three lots so two of the three lots would have access to an interior, neighborhood street rather than Lindbergh Boulevard. One lot has been taken by eminent domain, so now there are 22 lots. But Clayton Terrace has never subdivided these lots, the lot number has never exceeded 23, and no more than one residence has ever been built on a single lot.

[10] The restrictive covenant in *Berkley* provided, "No residence, shall be erected, altered, placed or permitted to remain on lots 4, 7, 8, 9, 10 which contains less than 26,000 cubic feet; and on lots 1, 2, 3, 5, 6, 11, 12 which contains less than 28,000 cubic feet." *708 S.W.2d at 227*.

the restriction for each lot was the same: no structure "shall be erected closer than 15 feet to any side of rear lot line …." The rear lot lines were set out on the original plat. This restriction, therefore, restricted placing a structure closer than 15 feet to any of those original lot lines. It could not be avoided by changing those rear lot lines by dividing one lot into two lots any more than the restriction in *Berkley* could be avoided by subdividing the lot.

Further, the indenture at issue in this case does more than limit residences to one per lot and require them to be a certain distance from the rear lot line set out in the plat; it also provides that, if lots are combined, still only a single home can be built on the combined lot. Similarly, another provision directs that if multiple lot owners exercise their right of first refusal to buy a lot which is being sold, they take pro rata shares of a single lot. In other words, even if purchased by other lot owners, those lot owners must each take a pro rata share in the single lot and are not permitted to divide the lot pro rata. Reviewing the "one residence per lot" provision in light of these other provisions – that is, in the context of the entire instrument, as directed by *Andrews, 163 S.W.2d at 1028* – the circuit court found it would violate the intent of the indentures to permit a lot to be subdivided such that there would be more than one residence per lot.

While 6 Clayton Terrace and the seperate opinion disagree with the circuit court's interpretation of the indenture language, "[a] provision [in a restrictive covenant] is not ambiguous merely because the parties disagree over its meaning." *Barry Harbor Homes Ass'n v. Ortega, 105 S.W.3d 903, 908 (Mo. App. 2003), quoting Sonoma Mgmt. Co. v. Boessen, 70 S.W.3d 475, 479 (Mo. App. 2002)* (alterations in original). Further, were the

concurring opinion's approach taken, many of the indenture's restrictions could be rendered meaningless simply by subdividing the lots. "Each provision is construed in harmony with the others to give each provision a reasonable meaning and avoid an interpretation that renders some provisions useless or redundant." *Wildflower, 25 S.W.3d at 534*. Restrictions like the "one residence per lot" provision and the restriction that multiple lot owners must take pro rata shares in a combined purchase would be without effect if a lot owner could avoid them simply by subdividing the lot after purchase. The intention here is clear – to protect the homeowners of Clayton Terrace by limiting the residences to one per original lot. The circuit court's finding on this issue is affirmed.

## VI.  THE CIRCUIT COURT ERRED IN AWARDING ATTORNEY'S FEES TO THE TRUSTEES BECAUSE THERE WAS INSUFFICIENT PROOF OF SPECIAL CIRCUMSTANCES

The trustees argue "special circumstances" exist justifying the award of attorney's fees because 6 Clayton Terrace engaged in intentional misconduct by concealing its attempt to purchase and subdivide Lot 6. "In considering a request for attorney's fees, Missouri has adopted the American Rule; that is, absent statutory authorization or contractual agreement, with few exceptions, each litigant must bear his own attorney's fee." *Incline Village Bd. of Trustees v. Edler, --- S.W.3d --- (Mo. banc Apr. 30, 2019)* (quotations omitted). The question is whether such an exception was shown here.

It appears this Court has found an exception to the American Rule when one party brought a declaratory judgment action that resulted in creation of a common fund that benefited a trust with multiple beneficiaries. *See Bernheimer v. First Nat'l Bank of Kan. City, 225 S.W.2d 745, 755 (Mo. banc 1949)*. This Court also approved the award of

24

attorney's fees as an exception to the American Rule in *Johnson v. Mercantile Trust Co. National Ass'n, 510 S.W.2d 33, 40 (Mo. 1974)*, when "the natural and proximate result of a wrong or breach of duty is to involve the wronged party in collateral litigation." *Accord Tupper v. City of St. Louis, 468 S.W.3d 360, 374 (Mo. banc 2015); Essex Contracting, Inc. v. Jefferson Cty., 277 S.W.3d 647, 657 (Mo. banc 2009).* Neither of these circumstances are alleged to be relevant here, however.

In *Mayor, Councilmen, & Citizens of City of Liberty v. Beard, 636 S.W.2d 330, 331 (Mo. banc 1982),* this Court recognized a court can award attorney's fees for "special circumstances." It did so, however, in the context of a declaratory judgment action in which section 527.100 specifically permits the recovery of "costs." *Id. Mayor* held that while these "costs" normally do not include attorney's fees, they may do so when "special circumstances" are shown. *Id., citing, Bernheimer, 225 S.W.2d at 745.*

While *Mayor* did not attempt to define what is encompassed in the term "special circumstances," the landmark case of *David Ranken, Jr. Technical Institute v. Boykins, 816 S.W.2d 189, 193 (Mo. banc 1991), overruled on other grounds by Alumax Foils, Inc. v. City of St. Louis, 939 S.W.2d 907, 911 (Mo. banc 1997)*, used the term in referring to all three previously recognized exceptions, that is, "special circumstances" involving a common fund, declaratory judgments, or requiring collateral litigation:

> Missouri has adopted the American Rule; that is, absent statutory authorization or contractual agreement, with few exceptions, each litigant must bear his own attorney's fee. *Mayor, Councilmen, & Citizens v. Beard*, 636 S.W.2d 330, 331 (Mo. banc 1982).
> Missouri courts have limited the exceptions to those cases involving "very unusual circumstances" or where the natural and proximate result of a breach of duty is to involve the wronged party in collateral litigation.

25

*Johnson v. Mercantile Trust Co. National Ass'n*, 510 S.W.2d 33, 40 (Mo. 1974). Sometimes the term "special circumstances" has been used. *Temple Stephens Co. v. Westenhaver*, 776 S.W.2d 438, 442 (Mo. App. 1989).

The declaratory judgment statutes under chapter 527 make no reference to attorneys' fees. However, several cases have recognized that attorneys' fees may be awarded as costs under section 527.100, RSMo 1986, where very unusual circumstances have been shown. *Beard*, 636 S.W.2d at 331.

Later cases from this Court have applied *Ranken*'s authorization of attorney's fees as costs permitted by section 527.100 in declaratory judgment actions when intentional misconduct was shown. *See, e.g., Incline Village, --- S.W.3d ---, citing Tupper, 486 S.W.3d at 374* ("[I]ntentional misconduct is a 'special circumstance' that may justify an award of attorney's fees"). But no case from this Court has been cited allowing a finding of "special circumstances" based on intentional misconduct outside the declaratory judgment context. To the contrary, *Ranken* listed a series of non-declaratory judgment actions in which it noted attorney's fees had been denied. *816 S.W.2d at 193.*

Later court of appeals cases nonetheless have applied the intentional misconduct exception to non-declaratory judgment actions when the party against whom the fees were awarded engaged in intentional conduct that was spiteful, fraudulent, or groundless. *See, e.g., St. Louis Title, LLC v. Talent Plus Consultants, LLC, 414 S.W.3d 24, 26 (Mo. App. 2013)* (recognizing "special circumstances" exception even though the action was one in contract, and a declaratory judgment was not sought); *Barr v. Mo. State Dep't of Soc. Servs., 565 S.W.3d 683, 691 (Mo. App. 2018)* (affirming award of attorney's fees in child abuse registry case because "[g]iven …unchallenged findings regarding the

26

Children's Division's conduct in this case, we cannot conclude that unusual or special circumstances were not present in this case justifying an award of attorney's fees").

Here, the trustees sought only injunctive and not declaratory relief against 6 Clayton Terrace and do not claim a common fund or collateral litigation resulted from 6 Clayton Terrace's actions. They rely on the additional "intentional misconduct" exception created *sub silencio* by the appellate courts when "special circumstances" involving unusually improper conduct are shown in non-declaratory judgment cases. This Court need not determine whether these appellate courts erred in extending the declaratory judgment exception to similar cases. Assuming, without deciding, that such a limited additional exception exists for intentional misconduct that is fraudulent, groundless or based solely on spite, this is not such a case.

There is no claim here of spite or purposeful attempts to injure other homeowners. Neither is there evidence of fraud. The intentional misconduct on which the claim for attorney's fees is based is the fact 6 Clayton Terrace failed to reveal before or after the time of purchase that it hoped to subdivide the property and, thereby, avoid the "one residence per lot" limitation. This does not constitute the kind of "intentional misconduct" that qualifies as "special circumstances."

The trustees fail to identify any duty on the part of 6 Clayton Terrace to reveal this information prior to the purchase. It was not in a fiduciary or confidential relationship with the trustees at that time. Indeed, it did not become the proposed owner of Lot 6 until the day before the closing. Further, this was an arms' length transaction, and the trustees cite no authority for a duty of a *purchaser* to provide such notice to the trustees of

property it does not yet own. Absent such a duty, 6 Clayton Terrace's decision not to inform the other homeowners proactively of its identity and motives, while potentially strategic, was not fraudulent nor can an intent to harm be inferred from its silence.

Similarly, no authority is cited for a duty after the sale to let the trustees know the new owners believed the indentures did not prohibit them from subdividing the lot. *See Volk Const. Co. v. Wilmescherr Drusch Roofing Co., 58 S.W.3d 897, 899 (Mo. App. 2001)* (finding fraud when defendant filed falsified UCC forms purporting to create a security interest in the assets of an insolvent corporation); *Temple Stephens Co. v. Westenhaver, 776 S.W.2d 438, 440 (Mo. banc 1989)* (finding fraud when defendant knowingly omitted a required, neighboring landowner from a rezoning application because that particular landowner opposed the rezoning). 6 Clayton Terrace's purpose was to make money, and it did not hide that purpose after the purchase. Buying, dividing, and reselling property for profit is not intentional misconduct.

Finally, while 6 Clayton Terrace proved to be incorrect that it could subdivide the lot, its arguments to the contrary were not frivolous or fraudulent. "'Special circumstances' contemplates something more than advocating a position a court finds wrong." *Incline Village, --- S.W.3d ---.* Special circumstances are not shown here. The award of attorney's fees to the trustees from 6 Clayton Terrace is reversed.

## VII. CONCLUSION

For the reasons stated here, this Court affirms the portion of the judgment refusing to invalidate the sale by Ms. Huey and holding the "one residence per lot" indenture provision is valid and precludes subdivision of the lot. It reverses the portion of the

28

judgment finding abuse of process on the part of the trustees as well as its awards of attorney's fees to Ms. Huey and the trustees.

_____
**LAURA DENVIR STITH, JUDGE**

Draper, C.J., Wilson, Russell, and Breckenridge, JJ., concur; Powell, J., concurs in part and dissents in part in separate opinion filed; Fischer, J., concurs in opinion of Powell, J.



# SUPREME COURT OF MISSOURI
## en banc

TRUSTEES OF CLAYTON )
TERRACE SUBDIVISION, )
    )
    Respondent/Cross-Appellant, )
    )
v. )    No. SC97349
    )
6 CLAYTON TERRACE, LLC, )
    )
and )
    )
JEANNETTE R. HUEY, TRUSTEE )
OF THE JANE R. HUEY LIFETIME )
TRUST AGREEMENT DATED )
MAY 21, 1998, )
    )
    Appellants/Cross-Respondents. )

**Opinion Concurring in Part and Dissenting in Part**

I respectfully dissent as to section V. B. of the principal opinion because I disagree with its conclusion that a restrictive covenant that states "[o]nly one residence shall be erected on each lot," precludes subdivision of a lot within Clayton Terrace.[1] Because nothing in the text of this restrictive covenant, or any other covenant governing Clayton

---

[1] I fully concur in sections I, II, III, IV, and V. A. of the principal opinion. I also concur in the result reached in section VI of the principal opinion.

Terrace, prohibits subdivision of lots, I would reverse the circuit court's judgment enjoining 6 Clayton Terrace from subdividing its privately owned lot.

"The right to own private property is a bedrock principle in American law." *Odegard Outdoor Advertising, LLC v. Bd. of Zoning & Adjustment of Jackson Cty.*, 6 S.W.3d 148, 149 (Mo. banc 1999). Indeed, this Court has explained "the right to acquire, hold, enjoy, and dispose of property, real or personal" is a fundamental right. *Stone v. City of Jefferson*, 293 S.W. 780, 782 (Mo. banc 1927). Buried within this bedrock principle is the right of property owners "to specify the uses to which land may be put and … to prevent use for any purpose not included." *Matthews v. First Christian Church of St. Louis*, 197 S.W.2d 617, 620 (Mo. 1946). Property owners may agree, therefore, to collectively restrict their property rights for a common purpose. But in the absence of such an agreement, the law seeks to promote "the free and untrammeled use of real property." *Steve Vogli & Co. v. Lane*, 405 S.W.2d 885, 889 (Mo. 1966). For this reason, restrictive covenants are not favored and are strictly construed. *Vinyard v. St. Louis Cty.*, 399 S.W.2d 99, 105 (Mo. 1966). "Restrictive covenants will not be extended by implication to include anything not clearly expressed in them." *Id*. Courts fail to zealously protect the fundamental right to freely own and use private property by enforcing restrictions that do not appear in the text of a covenant. *Lane*, 405 S.W.2d at 889.

The restrictive covenant at issue in the instant case provides, "Only one residence shall be erected on each lot." The plain and obvious purpose of this covenant is to prohibit the construction of multiple residences on a single lot. The provision does not in any way speak to lot owners' authority to subdivide their lots. The only way to conclude the

2

covenant prohibits subdivision is to infer the phrase "each lot" limits the total number of lots allowed in Clayton Terrace to those in existence when the covenant was adopted. While this inference is certainly plausible, inferring that the phrase "each lot" operates as a subdivision restriction violates the principle that restrictive covenants will not be extended by implication to include restrictions not clearly expressed. *Vinyard,* 399 S.W.2d at 105.

The principal opinion concludes the "one residence per lot" provision of the restrictive covenants precludes subdivision of the lots located within Clayton Terrace. *Slip op.* at 21. The principal opinion correctly reasons "the 'one residence per lot' indenture provision … indicates it was intended to prevent construction of multiple residences per original lot." *Id.* But the principal opinion errs by looking beyond the text of this indenture and reading into "the context of the instrument" to infer that "this language precludes 6 Clayton Terrace from subdividing Lot 6 into two lots to avoid the 'one residence per lot' restriction." *Id*. This inference violates the principle that restrictive covenants will not be enforced beyond the terms clearly expressed in the covenant. *Vinyard,* 399 S.W.2d at 105.

The principal opinion's reliance on *Berkley v. Conway Partnership*, 708 S.W.2d 225 (Mo. App. 1986), likewise, is misplaced. The restrictive covenant at issue in *Berkley* was fundamentally different from the covenant at issue here. The restrictive covenant in *Berkley* provided, "No residence, shall be erected, altered, placed or permitted to remain on lots 4, 7, 8, 9, 10 which contains less than 26,000 cubic feet; and on lots 1, 2, 3, 5, 6, 11, 12 which contains less than 28,000 cubic feet." *Id.* at 227. *Berkley* held this covenant expressly prohibited the construction of an undersized residence and also prohibited

3

subdivision because the "set specification of cubic feet for each residence **on each of twelve lots** reflects the developer's intention that these be the sole lots established by his original subdivision." *Id.* at 228 (emphasis added).  By contrast, the covenant in this case contains no language specifying a certain number of lots.  Although the covenant does specify "only one residence shall be erected on each lot," the principle of strict construction requires the Court to not infer anything more into this restriction.

Inferring a "no subdivision" restriction into the "one residence per lot" provision violates this Court's policy to promote the free use of property unless property owners have voluntarily and unambiguously surrendered their rights.  *See Vinyard*, 399 S.W.2d at 105. Because the covenants of Clayton Terrace do not expressly forbid lot owners from subdividing their lots, I would hold 6 Clayton Terrace is free to subdivide its lot and use the land for any lawful purpose not expressly forbidden by the covenants of Clayton Terrace.[2]

_____
W. Brent Powell, Judge

_____

[2] In section VI, the Court conducts a thoughtful and comprehensive analysis of whether 6 Clayton Terrace engaged in intentional misconduct by failing to reveal its intent to subdivide the property before purchasing the lot so as to justify an award of attorney fees. Because I believe, however, the covenants of Clayton Terrace do not preclude subdivision of 6 Clayton Terrace's lot, I would not reach the issue the Court decides in section VI.  In my view, Clayton Terrace should have prevailed on the subdivision issue.  The trustees, therefore, should have no claim to attorney fees in the first place.  However, because the Court ultimately holds the trustees are not entitled to recover attorney fees, I concur in the result the Court reached in section VI.

4