# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### February 22, 2023 Session

## PRATIK PANDHARIPANDE, M.D. v. FSD CORPORATION

**Appeal by Permission from the Court of Appeals**
**Chancery Court for DeKalb County**
**No. 2019-CV-60      Jonathan L. Young, Judge**

_____

### No. M2020-01174-SC-R11-CV

_____

This case arises from a dispute between a property owner and his homeowners' association. The property owner, Pratik Pandharipande, purchased a home in a vacation community on a Tennessee lake, intending to use it as a short-term rental. At the time of the purchase, the property was subject to covenants requiring that the home be used for "residential and no other purposes." The covenants were amended several years later to allow leases with minimum lease terms of thirty days. Pandharipande contends that neither the original covenants nor the amendments prohibit him from leasing his property for short terms of two to twenty-eight days. His homeowners' association disagrees on both scores. We agree with Pandharipande that the original covenants requiring residential use of the property do not bar his short-term rentals, but we agree with the homeowners' association that the amendments do. The trial court granted summary judgment in favor of the homeowners' association based on both the original covenants and the amendments. The Court of Appeals affirmed. We affirm the Court of Appeals in part, reverse in part, and remand for further proceedings consistent with this opinion.

### Tenn. R. App. P. 11 Appeal by Permission;
### Judgment of the Court of Appeals Affirmed in Part and Reversed in Part;
### Remanded to the Chancery Court

SARAH K. CAMPBELL, J., delivered the opinion of the court, in which HOLLY KIRBY, C.J., and SHARON G. LEE, JEFFREY S. BIVINS, and ROGER A. PAGE, JJ., joined.

Benjamin M. Rose, Brentwood, Tennessee, for the appellant, Pratik Pandharipande, M.D.

Gerald C. Wigger and Emmie Kinnard, Nashville, Tennessee, for the appellee, FSD Corporation.

# OPINION

## I.

### A.

Four Seasons is a housing development on Center Hill Lake in DeKalb County, Tennessee. FSD Corporation—or FSD for short—operates the Four Seasons homeowners' association and previously owned the properties that compose Four Seasons.

In 1984, FSD executed a Declaration of Covenants, Conditions, and Restrictions to "impose . . . mutually beneficial restrictions under a general plan of improvement for the benefit of all owners of residential property within Four Seasons development." The declaration provides that the restrictions are to "run with and bind" all of the properties listed on an exhibit attached to the declaration.[1] The declaration further states that FSD was "the owner of the real property" described in that exhibit as of the date of the declaration's execution.

Article XII of the declaration imposes use restrictions on the properties. Section 1, subsection (a) of that article provides that "each Lot shall be used for residential and no other purposes." Subsection (j) further provides that "no gainful profession, occupation, trade or other nonresidential use shall be conducted in any Lot." Those subsections read in full as follows:

> (a) . . . Except as otherwise provided in this Declaration, each Lot shall be used for *residential and no other purposes*. There shall not be constructed or maintained upon any Lot [any] duplex or multi-unit structure. Except as otherwise provided in [this] Declaration, the Common Area shall be used for recreational . . . and *other purposes directly related to the single-family use [of] the lots* authorized hereunder.

> . . . .

> (j) . . . *[N]o gainful profession, occupation, trade or other nonresidential use shall be conducted in any Lot* or upon the Common Area of any portion thereof, provided that this restriction shall not prohibit consultations, conferences, or the transaction of business by telephone or other electronic devices.

---

[1] Other covenants applied to the properties before 1984, but the parties agree that those covenants are no longer in effect.

The term "Lot" is defined in article I to mean "a portion or portions of the Properties made subject to the terms and conditions of this Declaration and intended for any type of independent ownership for construction and *use as a residence by a single family*."

Article XIII, section 4 governs delegation of use of the properties. It provides that "[a]ny owner may delegate, in accordance with the By-Laws of the Corporation, his or her right of enjoyment to the Common Area and facilities to the members of his or her family, *tenants*, and social invitees, subject to such rules and regulations as the Board may establish."

The declaration also establishes a process to amend the covenants and provides that amendments "may, but [are] not required to, impose . . . additional restrictions . . . on the land." Article XIII, section 2 states that amendments must be approved "by the affirmative vote (in person or by proxy) of a majority of the Class 'A' Stockholders." Class A stockholders include all record owners of any lot subject to the declaration, with the number of shares corresponding to the number of units owned. Amendments "must be recorded" with the DeKalb County Register of Deeds and "shall be effective when recorded."

The initial term of the covenants was thirty years from their recording date. After the initial term, the covenants are "automatically extended" for successive ten-year periods unless a majority of shareholders agree in writing to terminate them.

The parties dispute exactly when the 1984 covenants were recorded with the DeKalb County Register of Deeds, but they agree recording had occurred at least by 2000.[2] Neither Pandharipande nor FSD contends that the covenants have been terminated.

Pandharipande did not purchase his property in Four Seasons until 2015. The property was conveyed to him via warranty deed.[3] Pandharipande admitted both in his complaint and during summary judgment proceedings that, "assuming they are valid," the 1984 covenants "applied to [his] [p]roperty on the date [he] acquired [it]." He purchased the property "with the intent to lease [it] on a short-term basis" and soon began doing just

_____

[2] Pandharipande asserts that the 1984 covenants were not recorded until 2000 based on stamps that appear on the first page of the covenants. FSD says that the covenants were recorded on March 29, 1984, based on a stamp that appears near the end of the document. But FSD took a different position earlier in the litigation. In its answer to Pandharipande's complaint, FSD "[a]dmitted, upon information and belief" that the covenants were not recorded until 2000. And when Pandharipande asserted, on two different occasions, that it was undisputed that the covenants were not recorded until sixteen years after 1984, FSD agreed that this fact was undisputed. FSD also pointed out, however, that the covenants were recorded "before [Pandharipande's] purchase of the property."

[3] The warranty deed is not in the record on appeal. FSD attached to its brief in this Court a copy of a document purporting to be the warranty deed and asked that we take judicial notice of the document. We find it unnecessary to do so.

that. With the assistance of a property-management company, Pandharipande leased his property to third parties for rental terms ranging from two to twenty-eight days.

In 2018, a majority of FSD's shareholders voted to amend the covenants. In relevant part, the 2018 amendments provide that shareholders "shall be allowed" to lease their properties but also impose certain requirements and restrictions on any leases. One of those restrictions is that "[t]he length of [a] lease must be for a minimum of [thirty] consecutive days." The amendments contain a grandfather clause that allows "[a]ny owner engaged in leasing or subleasing activities as of the date of th[e] amendment . . . to continue leasing or subleasing activities until the expiration of the term of said lease or said lot is sold or conveyed to a third party." FSD recorded the amendments with the Dekalb County Register of Deeds on July 24, 2018.

B.

Notwithstanding the amendments, Pandharipande continued to lease his property for terms of fewer than thirty days. In March 2019, FSD's counsel sent Pandharipande a letter notifying him that he was violating the 2018 amendments.

Pandharipande responded by suing FSD in June 2019. His complaint sought a declaratory judgment that the 2018 amendments did not prohibit him from using his property as a short-term rental. He also sought an injunction prohibiting FSD from "taking any other action implying or expressly conveying" that Pandharipande was in violation of the 2018 amendments or "any other restrictive covenant."

FSD counterclaimed for declaratory and injunctive relief. The counterclaim sought a judgment declaring that Pandharipande's short-term rentals violated Four Seasons' governing documents and an injunction prohibiting him from continuing to lease his property on a short-term basis. FSD asserted that Pandharipande's short-term leases violated the 2018 amendments, but it did not argue at that time that they also violated the original 1984 covenants. In fact, in its answer to Pandharipande's complaint, FSD admitted "[u]pon information and belief . . . that no restrictive covenants prevented [Pandharipande] from leasing his property on a short-term basis at the time he purchased it."

In October 2019, while discovery was ongoing, Pandharipande moved for summary judgment. He argued that the 2018 amendments did not prohibit his short-term rentals for two reasons. First, he claimed that his short-term leases were allowed under the grandfather clause. Second, he contended that Tennessee law prohibits retroactive amendments that place additional restrictions on property rights. Although FSD's counterclaim had alleged only that Pandharipande's short-term rentals violated the 2018 amendments, FSD asserted in response to the motion for summary judgment that the rentals violated the 1984 covenants as well. In support of this argument, FSD cited the Court of Appeals' decision in *Shields Mountain Property Owners Ass'n v. Teffeteller*, No. E2005-00871-COA-R3-

CV, 2006 WL 408050 (Tenn. Ct. App. Feb. 22, 2006), which held that a covenant containing a residential-use restriction prohibited short-term rentals.

The trial court denied Pandharipande's motion for summary judgment at the hearing but reserved its ruling for forty-five days to allow FSD to move for summary judgment, which FSD did in April 2020. FSD again relied on *Teffeteller* in arguing that the residential-use requirement in the 1984 covenants prohibited Pandharipande from using his property as a short-term rental. FSD additionally argued that short-term rentals violate the 2018 amendments. In response, Pandharipande sought to distinguish *Teffeteller* and further contended that *Teffeteller*'s reasoning had been rejected by courts in other States. He also asserted that FSD should be estopped from relying on *Teffeteller* both because FSD's counterclaim alleges only a violation of the 2018 amendments and because FSD had allowed short-term rentals in the past. As for the 2018 amendments, Pandharipande reiterated the arguments he made in support of his own motion for summary judgment.

The trial court granted FSD's motion for summary judgment. Citing *Teffeteller*, the court concluded that the "plain language" of the 1984 covenants—specifically, the provision stating that "each Lot shall be used for residential and no other purposes"— prohibited Pandharipande from using his property as a short-term rental and that Pandharipande therefore was in violation of those covenants when he began renting his property in 2015. The court also rejected Pandharipande's estoppel argument. After noting that "no evidence [had been] offered that the [2018 amendments] w[ere] not properly promulgated," the court further held that the amendments prohibited Pandharipande's short-term rentals after they were recorded on July 24, 2018.

Pandharipande appealed and argued that the trial court had erred both by denying his motion for summary judgment and by granting FSD's motion. The Court of Appeals affirmed the trial court in all respects. *Pandharipande v. FSD Corp.*, No. M2020-01174-COA-R3-CV, 2022 WL 1280438, at *12 (Tenn. Ct. App. Apr. 29, 2022), *perm. app. granted*, (Tenn. Oct. 21, 2022). The court concluded that the 1984 covenants were "in effect when [Pandharipande] purchased [his] [p]roperty in July 2015" and prohibited Pandharipande from using his property for short-term rentals because that use was non-residential under *Teffeteller*. *Id.* at *6–7.

The Court of Appeals noted it was "undisputed" that a majority of FSD's stockholders approved the 2018 amendments and that the amendments were "duly recorded." *Id.* at *7. And it held that, once they became effective on July 23, 2018, the amendments prohibited Pandharipande from leasing his property for periods of fewer than thirty days. *Id.* at *12. The court rejected Pandharipande's argument that the amendments were impermissibly retroactive. *Id.* at *11. Although the court acknowledged that amendments to restrictive covenants are subject to review under the arbitrary-and-capricious standard, it found "no basis" for concluding that the 2018 amendments were arbitrary or capricious. *Id.*

Pandharipande filed an application for permission to appeal to this Court, which we granted. Our order granting review asked the parties to address whether there are genuine issues of material fact regarding the applicability of the 1984 covenants that should have precluded summary judgment. Specifically, we asked the parties to address "the date on which the 1984 Declaration first was recorded, the ownership on that date of the property which Pratik Pandharipande purchased in July 2015, and whether any of the conveyances in Pratik Pandharipande's chain of title exhibited an intent on the part of the grantor to impose the 1984 Declaration as a servitude."

## II.

"We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness." *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). A trial court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. A disputed fact is material if it "must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Tatham v. Bridgestone Ams. Holding, Inc.*, 473 S.W.3d 734, 749 (Tenn. 2015) (quoting *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)). "[D]isputes of material fact are 'genuine'—and therefore preclude the entry of summary judgment— only if the evidence produced at the summary judgment stage 'is such that a reasonable jury could return a verdict for the nonmoving party.'" *Rye*, 477 S.W.3d at 251 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The interpretation of "restrictive covenants, like [the interpretation of] other written contracts, is a question of law" that we review de novo. *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 480–81 (Tenn. 2012); *see also BSG, LLC v. Check Velocity, Inc.*, 395 S.W.3d 90, 92 (Tenn. 2012) ("The interpretation of a written contract is a question of law, which we review de novo.").

## III.

We first address whether there are genuine issues of material fact that preclude summary judgment. We then turn to the dispositive legal issues in this case—whether either the 1984 covenants or the 2018 amendments prohibit Pandharipande's short-term rentals.

## A.

Our order granting review asked the parties to address whether there are any genuine issues of material fact regarding the applicability of the 1984 covenants to Pandharipande's property. Because the provisions of those covenants that are at issue here limit the use of

the property, they are properly understood as restrictive covenants. *Phillips v. Hatfield*, 624 S.W.3d 464, 473 (Tenn. 2021) (explaining that a covenant that "limits the uses that can be made by an owner or occupier of land" is called a "restrictive covenant" or, less often, a "negative easement"). As we explained in *Phillips*, a restrictive covenant runs with the land—that is, it "passes automatically with the land when ownership or possession changes, whether or not the successor consents"—when "it is intended to do so, has been effectively created, is not invalid for certain reasons, and has not terminated in certain ways." *Id.* And "a person cannot restrict the use of another's land simply by recording restrictive covenants that purport to apply to that land." *Id.* at 475. Rather, as a general matter, the restrictive covenant must be created by the owner of the property. *Id.*

The parties' briefs focused primarily on the recording date of the 1984 covenants and failed to fully address who owned the property on that date or whether the conveyances in Pandharipande's chain of title exhibited an intent to impose a servitude.

In his brief, Pandharipande says it is undisputed that the 1984 covenants were not recorded until 2000. Alternatively, he argues that the recording date of the covenants is a genuine issue of material fact that should have precluded the trial court from granting FSD's summary judgment motion. Pandharipande concedes that "he had knowledge of the 1984 [covenants] before purchasing the [p]roperty," but he also contends that there was no evidence in the record to establish the chain of title to the property.

FSD argues that "[t]he Register's stamp and certification on the last page" of the 1984 covenants "leave no doubt that" the covenants were recorded in 1984, not in 2000 as Pandharipande contends. Without acknowledging its admissions in the trial court that the covenants were not recorded until 2000, FSD urges this Court to "take judicial notice" of the 1984 recording date. FSD also contends, however, that any dispute about the recording date is immaterial because "it is undisputed that the 1984 [covenants] applied to" Pandharipande's property when he purchased it in 2015. As for the chain of title, FSD says that Pandharipande "admitted, for purposes of summary judgment, that he had notice of the 1984 [covenants] and that the [covenants] could be amended."

The parties also addressed the applicability of the 1984 covenants at oral argument. When asked about the ownership of the property at issue at the time the covenants were executed and whether the covenants appear in Pandharipande's chain of title, FSD pointed the Court to certain documents available in the DeKalb County Register of Deeds Office. But FSD acknowledged that those documents are not included in the record on appeal. FSD maintained that it was not required to prove the applicability of the 1984 covenants because Pandharipande had admitted that those covenants applied to his property when he purchased it in 2015.

During rebuttal, Pandharipande's counsel was asked whether he intended to concede that the 1984 covenants applied to Pandharipande's property when he acquired it in 2015.

Counsel responded that "if [the covenants] are legally effective, then they are the ones that likely applied to the property at issue." By "legally effective," counsel explained, he meant "appropriately promulgated and recorded at whatever time." Counsel also conceded that there were no genuine issues of material fact regarding who owned the property when the covenants came into effect. And he further conceded that the 1984 covenants were in the chain of title for the property.

Taken together, the parties' admissions in the trial court and representations to this Court in both their briefs and at oral argument make clear that there are no genuine issues of material fact regarding whether the 1984 covenants apply to Pandharipande's property.[4] Pandharipande admitted that, if the covenants are legally effective, then they applied to his property when he purchased it in 2015. And he has never argued that the covenants were not validly promulgated or not recorded until after he acquired his property. We agree with FSD that, given this admission, it was unnecessary for FSD to introduce proof regarding ownership of the property at the time the covenants were recorded or the chain of title. *See, e.g.*, *Tenn. Dep't of Hum. Servs. v. Barbee*, 714 S.W.2d 263, 267 (Tenn. 1986) ("No evidence is necessary to establish a fact admitted, and no evidence should be permitted to refute it."). We also agree with FSD that, since it is undisputed that the 1984 covenants were recorded before Pandharipande purchased his property, any dispute regarding the precise recording date of those covenants is immaterial to the substantive legal issues before this Court.

B.

The core issue in this appeal is whether Pandharipande is prohibited from using his property for short-term rentals. FSD, pointing to both the 1984 covenants and the 2018 amendments, says "yes." Pandharipande says the opposite. We begin with the 1984 covenants and then turn to the amendments.

Our consideration of these issues is guided by several principles. First, we keep in mind that "[a] property owner's right to own, use, and enjoy private property is a fundamental right." *Phillips*, 624 S.W.3d at 474 (quoting *Hughes*, 387 S.W.3d at 474). Second, because restrictive covenants are "in derogation of the right of free use and enjoyment of property," they are "strictly construed" and should not be extended "to any activity not clearly and expressly prohibited by [their] plain terms." *Williams v. Fox*, 219 S.W.3d 319, 324 (Tenn. 2007); *see also, e.g.*, *Phillips*, 624 S.W.3d at 475; *Hughes*, 387

---

[4] Pandharipande's factual concessions at oral argument were sufficiently "deliberate and clear" to constitute binding judicial admissions. *See Old Hickory Coaches, LLC v. Star Coach Rentals, Inc.*, 652 S.W.3d 802, 814 (Tenn. Ct. App. 2021) ("[J]udicial admissions of fact must be deliberate and clear, while legal conclusions are rarely considered to be binding judicial admissions." (quoting *Com. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007))); *see also Crowe v. Coleman*, 113 F.3d 1536, 1542 (11th Cir. 1997) ("[W]aivers and concessions made in appellate oral arguments need to be unambiguous . . . .").

S.W.3d at 481; *Arthur v. Lake Tansi Vill., Inc.*, 590 S.W.2d 923, 927 (Tenn. 1979); *Shea v. Sargent*, 499 S.W.2d 871, 872–73 (Tenn. 1973); *Turnley v. Garfinkel*, 362 S.W.2d 921, 923 (Tenn. 1962); *Lowe v. Wilson*, 250 S.W.2d 366, 367 (Tenn. 1952). "When the terms of a covenant may be construed in more than one way, courts must resolve any ambiguity against the party seeking to enforce the restriction and in a manner which advances the unrestricted use of the property." *Hughes*, 387 S.W.3d at 481 (quoting *Williams*, 219 S.W.3d at 324). Third, because a covenant is a contract, *see Hughes*, 387 S.W.3d at 480–81, we interpret it by "look[ing] to the plain meaning of the words in the document," *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006); *see also Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008) (instructing that a "contract is interpreted according to its plain terms as written"). We also consider the entire document in which the words appear, because "one clause may modify, limit or illuminate another." *Maggart*, 259 S.W.3d at 704 (quoting *Cocke Cnty. Bd. of Hwy. Comm'rs v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985)). Fourth, we may conclude that the language in a covenant is ambiguous if it is "susceptible of more than one reasonable interpretation." *Memphis Hous. Auth. v. Thompson*, 38 S.W.3d 504, 512 (Tenn. 2001). But we must employ all traditional tools of interpretation before reaching that conclusion. *Cf. State v. Deberry*, 651 S.W.3d 918, 930 (Tenn. 2022) ("A court should deem statutory language ambiguous only after employing all of the traditional tools of statutory construction, including consulting dictionary definitions, examining statutory structure and context, and applying well-established canons of statutory construction.").

1.

As an initial matter, Pandharipande contends that FSD should be judicially and equitably estopped from arguing that the 1984 covenants prohibit his short-term rentals.[5] We reject those arguments.

The doctrine of judicial estoppel exists to "ensure the integrity of the judicial process." *Kershaw v. Levy*, 583 S.W.3d 544, 548 (Tenn. 2019) (quoting John S. Nichols, *Safeguarding the Truth in Court: The Doctrine of Judicial Estoppel*, 13 S.C. Law. 32, 34 (2002)). It prohibits a party from taking "a position that is directly contrary to or inconsistent with a position previously taken by the party." *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 314 (Tenn. 2009) (quoting *Guzman v. Alvares*, 205 S.W.3d 375, 382 (Tenn. 2006)). In Tennessee, however, the doctrine applies "only when a party has attempted to contradict by oath a sworn statement previously made." *Id.* at 315. And it applies only when the inconsistent sworn statement concerns an issue of fact. *Kershaw*, 583 S.W.3d at 549.

---

[5] Pandharipande also argues that we should reverse the Court of Appeals because it failed to address his estoppel arguments. Our conclusion that his estoppel arguments fail on the merits pretermits that issue.

Pandharipande argues that judicial estoppel applies here because FSD made inconsistent arguments to the trial court about the 1984 covenants. FSD initially stated in its answer to Pandharipande's complaint that "no restrictive covenants prevented [Pandharipande] from leasing his property on a short-term basis at the time he purchased it" in 2015. During summary judgment briefing, however, FSD argued that the 1984 covenants prohibited Pandharipande's short-term rentals.

Pandharipande's judicial estoppel argument fails for two reasons. First, none of the purportedly inconsistent statements by FSD were made under oath. They instead appeared in court filings that were signed by counsel, but not sworn or verified. Second, the statements amounted to legal conclusions about the effect of the 1984 amendments. *Cf. id.* at 545 (holding that a sworn acknowledgment that a divorce settlement was "fair and equitable" was a "context-related legal conclusion" (quoting *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 802 (1999))). As explained above, the doctrine of judicial estoppel is triggered only by inconsistent statements regarding issues of *fact*.

The doctrine of equitable estoppel applies "[i]n those instances where no oath is involved but the party is attempting to gain an unfair advantage by maintaining inconsistent legal positions." *Cracker Barrel*, 284 S.W.3d at 315. The party asserting equitable estoppel must establish that the other party (1) engaged in conduct amounting to false representations or concealment of material facts, (2) intended or expected that the party asserting equitable estoppel would rely on that conduct, and (3) had actual or constructive knowledge of the real facts. *Osborne v. Mountain Life Ins. Co.*, 130 S.W.3d 769, 774 (Tenn. 2004). The party asserting estoppel also must prove that it (1) lacked knowledge of the real facts, (2) relied on the other party's conduct, and (3) was prejudiced. *Id.*; *see also Cracker Barrel*, 284 S.W.3d at 315; *Ryan v. Lumbermen's Mut. Cas. Co.*, 485 S.W.2d 548, 550 (Tenn. 1972) ("[T]he party to whom [the false representation or concealment] was made must have relied on or acted on it to his prejudice" (quoting 31 C.J.S. *Estoppel* § 67)). "[O]rdinarily," moreover, "misrepresentations of law, being nothing more than opinions of the person making them, cannot be the basis of an equitable estoppel." *Ryan*, 485 S.W.2d at 550–51; *see also Brumit v. Mut. Life Ins. Co. of N.Y.*, 156 S.W.2d 377, 378 (Tenn. 1941) ("An estoppel in pais must rest on a statement of fact, not on a statement of law."); 31 C.J.S. *Estoppel* § 115, Westlaw (database updated Aug. 2023) ("[F]or equitable estoppel to apply, the false representation must be one of existing material fact, and not of intention, nor may it be a conclusion from facts or a conclusion of law.").

Pandharipande's equitable estoppel argument likewise fails. Pandharipande points to evidence that two FSD employees leased their properties in Four Seasons on a short-term basis before the 2018 amendments were recorded. He also points to emails between FSD's board members and minutes from FSD's board meetings which suggest that the board believed short-term rentals were permitted under the 1984 covenants. But he fails to explain how any of this evidence establishes that FSD made false representations of material fact or concealed material facts. Indeed, FSD's belief regarding the effect of the

1984 amendments is not a material fact at all; it is an opinion about a legal issue. *See Ryan*, 485 S.W.2d at 551. Nor does he explain in what way he relied on FSD's conduct or was prejudiced by that reliance.

Because Pandharipande cannot satisfy the elements of either judicial or equitable estoppel, those doctrines do not apply here, and we may consider FSD's arguments that the 1984 covenants prohibit Pandharipande's short-term rentals.

2.

Whether a restrictive covenant that limits the use of property to residential purposes prohibits short-term rentals is a question of first impression for this Court. Our Court of Appeals considered a similar question in *Teffeteller* nearly two decades ago. The restrictive covenant at issue in that case provided that "[a]ll lots shall be used for residential purposes exclusively." *Teffeteller*, 2006 WL 408050, at *1. The Court of Appeals held that this covenant prohibited short-term rentals. *Id.* at *6. The court reasoned that short-term renters did not use the property for a residential purpose because, although "they may well eat, sleep, relax, and bathe while there, they do not reside there." *Id.* at *4. They instead "use the property in the same way that people use a motel." *Id.* The court rejected as "untenable" the property owner's view that "use of the property for 'eating, sleeping, relaxing, and bathing' makes the use residential." *Id.* Accepting this argument, the court explained, "would lead to the conclusion that the use of a motel room, or a camper, or a tent during a vacation stay or even staying in a hospital room would constitute a residential use." *Id.*

Pandharipande urges us to reject *Teffeteller*. He contends that *Teffeteller*'s "underpinnings have radically changed over the last [sixteen] years" as "owner-occupied [short-term rentals] have flourished in the marketplace." Citing cases from other jurisdictions, he also asserts that courts overwhelmingly have adopted a broader reading of "residential use."

FSD, by contrast, asks us to adopt *Teffeteller*'s reasoning. FSD maintains that *Teffeteller* is not an outlier. And it argues that cases reaching the opposite conclusion either involved "ambiguous" covenants distinguishable from the one at issue here or interpreted "residential" too broadly, in a manner that sweeps in all short-term rentals.

We conclude that the "residential and no other purposes" provision in the 1984 covenants does not clearly prohibit short-term rentals. At best for FSD, the provision is ambiguous. Because any ambiguities in restrictive covenants must be resolved in favor of the property owner and in a manner that furthers unrestricted use of the property, *Hughes*, 387 S.W.3d at 481, we hold that the 1984 covenants do not prohibit Pandharipande's short-term rentals. To reach that conclusion, we examine dictionary definitions of the relevant terms, other provisions in the covenants, and case law from other jurisdictions.

a.

In arguing that the 1984 covenants prohibit short-term rentals, FSD relies primarily on the requirement that "each Lot shall be used for residential and no other purposes." Our task is to determine what that phrase means. We start by consulting dictionary definitions of the phrase's key terms: "used," "residential," and "purposes." *See Griffis v. Davidson Cnty. Metro. Gov't*, 164 S.W.3d 267, 275–76 (Tenn. 2005) (interpreting terms in a deed by relying on "[s]everal standard turn-of-the-century dictionaries" because the deed was executed in 1908); *see also Royalton Woods Homeowner Ass'n v. Soholt*, No. M2018-00596-COA-R3-CV, 2019 WL 366525, at *9 (Tenn. Ct. App. Jan. 29, 2019) (relying on the American Heritage Dictionary of the English Language to interpret the word "maintenance" in a restrictive covenant).

The definition of "used" is simple enough in this context. To "use" something means "[t]o put into service or apply for a purpose; employ." *Use*, The American Heritage Dictionary of the English Language 1966 (3d ed. 1992); *see also Use*, 19 The Oxford English Dictionary 350 (2d ed. 1989) ("The act of employing a thing for any (esp. a profitable) purpose; the fact, state, or condition of being so employed; utilization or employment for or with some aim or purpose, application or conversion to some (esp. good or useful) end.").

Although the definition of "used" is fairly straightforward, it is unclear *whose* use of the property is relevant. In the phrase "shall be used for residential and no other purposes," the term "used" is a passive verb with no subject. Should the focus be on the property owner's use of the property or instead—in the case of a rental—on the occupant's use of the property? The text does not answer that question.

The definition of "purposes" is also reasonably clear. A "purpose" is "[t]he object toward which one strives or for which something exists; an aim or a goal." *Purpose*, The American Heritage Dictionary of the English Language 1471 (3d ed. 1992); *see also Purpose*, 12 The Oxford English Dictionary 878 (2d. ed. 1989) ("That which one sets before oneself as a thing to be done or attained; the object which one has in view."); *Purpose*, Webster's Third New International Dictionary 1847 (1981) ("something that one sets before himself as an object to be attained: an end or aim to be kept in view in any plan, measure, exertion, or operation").

Dictionary definitions of "residential" and related terms are less helpful. Those definitions point in two different directions. Some suggest that the term has a temporal element and requires a degree of permanence. Others, however, suggest that the term includes shorter stays as well.

Definitions of "residential" generally rely on and reference related terms such as "residence," "reside," or "resident." For example, the Oxford English Dictionary defines

"residential" as "[s]erving or used as a residence; in which one resides" or "[c]onnected with, pertaining or relating to, residence or residences (in general or specific sense)." *Residential*, 13 The Oxford English Dictionary 709 (2d ed. 1989). Other dictionary definitions are similar. *See, e.g.*, *Residential*, The American Heritage Dictionary of the English Language 1535 (3d ed. 1992) ("[o]f, relating to, or having residence" or "[o]f, suitable for, or limited to residences"); *Residential*, The Random House Dictionary of the English Language 1638 (2d ed. 1987) ("of or pertaining to residence or to residences" or "suited for or characterized by private residences"); *Residential*, Webster's Third New International Dictionary of the English Language 1931 (1981) ("used, serving, or designed as a residence or for occupation by residents").

Several dictionaries define the terms "residence" and "reside" in a manner that connotes permanence. The Oxford English Dictionary defines "residence" to mean "[t]he place where one resides; one's dwelling-place; the abode *of* a person (esp. one of some rank or distinction)." *Residence*, 13 The Oxford English Dictionary 707 (2d ed. 1989). The term "reside," in turn, means "[t]o dwell permanently or for a considerable time, to have one's settled or usual abode, to live, *in* or *at* a particular place." *Reside*, *id.* at 706. In the same vein, the American Heritage Dictionary defines "residence" as "[t]he place in which one lives; a dwelling" or "[t]he act or a period of residing in a place." *Residence*, The American Heritage Dictionary of the English Language 1535 (3d ed. 1992). And "reside" means "[t]o live in a place permanently or for an extended period." *Reside*, *id.* The Random House Dictionary, too, defines "residence" to mean "the place, esp. the house, in which a person lives or resides; dwelling place." *Residence*, The Random House Dictionary of the English Language 1638 (2d ed. 1987). And it likewise defines "reside" to mean "to dwell permanently or for a considerable time." *Reside*, *id.*

Some definitions of "resident," however, are broad enough to include shorter stays. Recall that Webster's Third New International Dictionary defines "residential" as "used, serving, or designed as a residence or for occupation by residents." *Residential*, Webster's Third New International Dictionary of the English Language 1931 (1981). The term "residence" is defined to mean "a temporary or permanent dwelling place, abode, or habitation to which one intends to return as distinguished from a place of temporary sojourn or transient visit." *Residence*, *id.* The term "resident" means "one who resides in a place: one who dwells in a place for a period of some duration—often distinguished from inhabitant." *Resident*, *id.* The term "inhabitant," however, is defined as "a person who dwells or resides *permanently* in a place as distinguished from a *transient* lodger or visitor." *Inhabitant*, *id.* at 1163 (emphasis added). If a resident is often distinguished from an inhabitant, and an inhabitant is often distinguished from a *transient* visitor, then a resident could also include a transient guest. The Oxford English Dictionary also defines "resident" to include transient guests such as hotel guests. *Resident*, 13 The Oxford English Dictionary 709 (2d ed. 1989) ("One who resides permanently in a place; sometimes *spec.* applied to inhabitants of the better class. *Also, a guest staying one or more nights at a hotel or boarding-house.*" (emphasis added)).

Even if the root words of "residential" are best understood to require a degree of permanence, definitions of "residential" itself—which, after all, is the term we are interpreting—are more flexible. The adjective "residential" describes not only nouns that serve as residences but also nouns that relate to, pertain to, or are connected with residences. One could use a property for residential purposes, then, by employing it for aims related to residences. Using a property to house short-term visitors who engage in largely the same activities as permanent residents—sleeping, eating, bathing, relaxing—would seem to satisfy this test. At the very least, it would not be unreasonable to interpret the covenants in this way.

Restrictions on property use must be clear and unambiguous. *Williams*, 219 S.W.3d at 324. We are unable to conclude, based on dictionary definitions alone, that the 1984 covenants clearly and expressly prohibit Pandharipande from leasing his property for short terms of two to twenty-eight days.

b.

Consideration of the covenants as a whole leads to the same conclusion. Section 1, subsection (a) of article XII says that "each *Lot* shall be used for residential and no other purposes." The covenants define the term "Lot" as "a portion . . . of the Properties . . . intended for any type of independent ownership for construction and *use as a residence* by a single family." As explained, dictionary definitions of "residential" and related words do not unambiguously exclude transient stays. So the fact that a "Lot" must be intended for "use as a residence by a single family" does not necessarily mean that it must be used as a permanent or long-term residence. Moreover, the definition of "Lot" is only that—a definition—and does not itself impose restrictions on use of the property.

Also consider section 1, subsection (j) of article XII. That provision says that "no gainful profession, occupation, trade *or other nonresidential use* shall be conducted in any Lot." Because the catchall phrase "other nonresidential use" follows an enumerated list, we apply the *ejusdem generis* canon to shed light on its meaning: "where general words follow the enumeration of particular classes of things, the general words will be construed as applying only to things of the same general class as those enumerated." *Sallee v. Barrett*, 171 S.W.3d 822, 829 (Tenn. 2005) (quoting Black's Law Dictionary 517 (6th ed. 1990)); *see also* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012) (explaining that in a list like "dogs, cats, horses, cattle, and other animals," the *ejusdem generis* canon "implies the addition of *similar* after the word *other*").

A use that is "nonresidential" is one that is similar to conducting a "gainful profession, occupation, or trade" on the property. The terms "profession," "occupation," and "trade" all refer to something that one does habitually to earn a living. *See, e.g.*, *Profession*, 12 The Oxford English Dictionary 573 (2d ed. 1989) ("Any calling or occupation by which a person habitually earns his living."); *Occupation*, 10 The Oxford

English Dictionary 682 (2d ed. 1989) ("an employment, business, calling"); *Trade*, 18 The Oxford English Dictionary 348 (2d ed. 1989) ("The practice of some occupation, business, or profession habitually carried on, esp. when practised as a means of livelihood or gain"). The phrase "other nonresidential use" therefore is best understood to mean an activity regularly conducted on the property as a means of earning money. To be sure, using a property as a short-term rental ordinarily generates income for the owner. But the only activities that are regularly conducted on the property when it is being used as a short-term rental are things like eating and sleeping—activities in which a resident would engage that are not similar to performing a profession, occupation, or trade. As explained above, it is reasonable to consider those activities residential in nature. Accordingly, we do not read subsection (j) to exclude from the category of "residential" uses any use that generates income for the owner.

Pandharipande contends that section 4 of article XIII makes clear that short-term rentals are allowed. That section allows an owner to "delegate . . . his or her right of enjoyment to the Common Area and facilities to the members of his or her family, *tenants*, and social invitees, subject to such rules and regulations as the Board may establish." According to Pandharipande, because this provision refers to tenants, the covenants plainly contemplate that properties may be leased and do not limit the length of such leases. We agree with Pandharipande that this reference to tenants presupposes that at least *some* rentals are allowed. But the provision provides little clarity regarding the short-term rentals at issue here. Because it is not Pandharipande's burden to prove that the covenants clearly *allow* his short-term rentals, however, that lack of clarity does not doom his position. Instead, it reinforces our conclusion that the covenants are ambiguous and do not clearly *prohibit* his short-term rentals.

c.

Case law from other jurisdictions lends further support to our conclusion that the 1984 covenants do not clearly prohibit short-term rentals. Nearly all courts to have considered whether residential-purposes provisions in restrictive covenants prohibit short-term rentals have held they do not. Many of these courts have concluded that the term "residential" has no temporal element and refers only to "ordinary living purposes" such as relaxing, eating, sleeping, and bathing. *Slaby v. Mountain River Ests. Residential Ass'n,* 100 So. 3d 569, 579–80 (Ala. Civ. App. 2012); *accord Houston v. Wilson Mesa Ranch Homeowners Ass'n*, 360 P.3d 255, 259 (Colo. App. 2015) ("[W]e agree . . . that mere temporary or short-term use of a residence does not preclude that use from being 'residential.'"); *Santa Monica Beach Prop. Owners Ass'n v. Acord*, 219 So. 3d 111, 114 (Fla. Dist. Ct. App. 2017) ("[I]n determining whether short-term vacation rentals are residential uses of the property, the critical issue is whether the renters are using the property for ordinary living purposes such as sleeping and eating, not the duration of the rental."); *Lowden v. Bosley*, 909 A.2d 261, 267 (Md. 2006) ("The fact that the owner receives rental income is not, in any way, inconsistent with the property being *used* as a

residence . . . . 'Residential use,' without more, has been consistently interpreted as meaning that the use of the property is for living purposes, or a dwelling, or a place of abode."); *Lake Serene Prop. Owners Ass'n v. Esplin*, 334 So. 3d 1139, 1143 (Miss. 2022) ("The salient point is whether or not the property itself is being used in a manner that a place of abode would be used, not how long the property is being used as a place of abode."); *Ests. at Desert Ridge Trails Homeowners' Ass'n v. Vazquez*, 300 P.3d 736, 742 (N.M. Ct. App. 2013) (declining to "attach any requirement of permanency or length of stay" (quoting *Mason Family Tr. v. DeVaney*, 207 P.3d 1176, 1178 (N.M. Ct. App. 2009))); *Wilson v. Maynard*, 961 N.W.2d 596, 604 (S.D. 2021) ("It is undisputed the Property is used to eat, sleep, and enjoy recreational activities. Therefore, short-term vacation rentals are a residential purpose consistent with the Covenants."); *Tarr v. Timberwood Park Owners Ass'n*, 556 S.W.3d 274, 291 (Tex. 2018) ("[S]o long as the occupants to whom [the owner] rents his single-family residence use the home for a 'residential purpose,' no matter how short-lived, neither their on-property use nor [the owner's] off-property use violates the restrictive covenants in the . . . deeds."); *Wilkinson v. Chiwawa Cmtys. Ass'n*, 327 P.3d 614, 620 (Wash. 2014) ("If a vacation renter uses a home 'for the purposes of eating, sleeping, and other residential purposes,' this use is residential, not commercial, no matter how short the rental duration." (quoting *Ross v. Bennett*, 203 P.3d 383, 388 (Wash. Ct. App. 2008))).[6]

Other courts have acknowledged that the term "residential" at least sometimes has a temporal connotation. *See, e.g.*, *Applegate v. Colucci*, 908 N.E.2d 1214, 1220 (Ind. Ct. App. 2009) ("[W]e recognize that . . . the definition of residential seems to contemplate a more permanent presence . . . ."); *Craig Tracts Homeowners' Ass'n v. Brown Drake, LLC*, 477 P.3d 283, 286 (Mont. 2020) ("[T]he common understanding of the word 'residential' often goes beyond the mere existence of an activity at a fleeting instant in time to imply a pattern of regularity or duration."); *Yogman v. Parrott*, 937 P.2d 1019, 1021 (Or. 1997) ("[A] 'residence' . . . can refer to a place where one intends to live for a long time."); *Garrett v. Sympson*, 523 S.W.3d 862, 867 (Tex. Ct. App. 2017) (concluding that "residential purposes" could reasonably be interpreted to require "an intention to be physically present in a home for more than a transient stay"); *Scott v. Walker*, 645 S.E.2d 278, 283 (Va. 2007) (noting possibility that "a residential purpose requires an intention to be physically present in a home for more than a transient stay").

But because the term "residential" can also refer to stays of a shorter duration, these courts ultimately found the covenants at issue ambiguous and held that they did not clearly prohibit short-term rentals. *See, e.g.*, *Applegate*, 908 N.E.2d at 1220 ("Although we

---

[6] Other courts have held that residential-purposes provisions do not prohibit short-term rentals based on different reasoning. *See, e.g.*, *Vera Lee Angel Revocable Tr. v. Jim O'Bryant and Kay O'Bryant Joint Revocable Tr.*, 537 S.W.3d 254, 258 (Ark. 2018) ("[T]here is absolutely no evidence, or even a suggestion, that renting the property in any way changed the essential character of the house as a 'residence.'"); *Russell v. Donaldson*, 731 S.E.2d 535, 538–39 (N.C. Ct. App. 2012) (relying on three cases from other jurisdictions involving "nearly identical" covenants and fact patterns).

recognize that . . . the definition of residential seems to contemplate a more permanent presence . . . it would have been easy to explicitly state this and make the covenant unambiguous. . . . [B]ecause the language in the covenants is ambiguous, [the owner's] short-term rental of its cabins does not run afoul of the covenants."); *Craig Tracts*, 477 P.3d at 287 ("We cannot say that the many jurisdictions . . . to have adopted [a non-temporal] interpretation of 'residential' were unreasonable. Since there are multiple reasonable interpretations of [residential], we join with those courts to have found such language ambiguous in this context."); *Yogman*, 937 P.2d at 1021 ("The ordinary meaning of 'residential' does not resolve the issue between the parties . . . because a 'residence' can refer simply to a building used as a dwelling place, or it can refer to a place where one intends to live for a long time. . . . [Therefore] this portion of the restrictive covenant is ambiguous."); *Garrett*, 523 S.W.3d at 867 ("'[R]esidence purposes' is ambiguous . . . both as to whether [it] requires an intention to be physically present in a home for more than a transient stay and as to whether the focus of the inquiry is on the owner's use of the Property or the renter's use. . . . Because we conclude that the Restriction . . . is ambiguous, we must strictly construe the ambiguity against Appellees and resolve all doubts in favor of the free-and-unrestricted use of the Property."); *Scott*, 645 S.E.2d at 283 (similar).

Only a few courts have held that a residential-purposes provision unambiguously prohibits short-term rentals. *See Hensley v. Gadd*, 560 S.W.3d 516, 524 (Ky. 2018) ("[O]ne-night, two-night, weekend, weekly inhabitants cannot be considered 'residents' within the commonly understood meaning of that word . . . ."); *Edwards v. Landry Chalet Rentals, LLC*, 246 So. 3d 754, 758 (La. Ct. App. 2018) ("The occupants are in the property on a transient basis only and are not utilizing the property for residential purposes."); *cf. O'Connor v. Resort Custom Builders, Inc.*, 591 N.W.2d 216, 221 (Mich. 1999) ("[R]esidential purposes [refers to] . . . a place where someone lives, and has a permanent presence . . . as a resident, whether they are physically there or not.").[7]

Decisions from other jurisdictions of course do not bind us. But the fact that so many other courts have held that similar residential-purposes provisions either unambiguously *allow* short-term rentals or do not unambiguously *prohibit* them further supports our conclusion that the 1984 covenants do not clearly bar Pandharipande's short-term rentals. *See Martin v. Powers*, 505 S.W.3d 512, 520 (Tenn. 2016) (noting, in concluding that certain language in an insurance policy was ambiguous, that other jurisdictions had held similar language ambiguous); *Memphis Hous. Auth.*, 38 S.W.3d at 512 (noting that there was a "split of authority" in other jurisdictions to support a conclusion that the language was ambiguous). If FSD were right that the 1984 covenants plainly prohibit short-term rentals, it is unlikely that so many other courts would have concluded otherwise.

---

[7] The question in *O'Connor* was whether a restrictive covenant prohibited timeshares. 591 N.W.2d at 221. *Eager v. Peasley* extended *O'Connor*'s reasoning to short-term rentals. 911 N.W.2d 470, 476–77 (Mich. Ct. App. 2017).

We now join those courts that have found residential-purposes provisions ambiguous with respect to whether short-term rentals are allowed. As we must, we resolve this ambiguity in favor of Pandharipande and hold that the 1984 covenants do not prohibit his short-term rentals.

3.

That does not end our inquiry: we also must consider the 2018 amendments. Pandharipande does not dispute that the language in the amendments requiring a minimum lease term of thirty days, standing alone, would prohibit his short-term rentals. But he offers two arguments why the amendments nevertheless do not bar him from continuing to lease his property. First, he contends that the grandfather clause in the amendments allows his rentals. Second, he maintains that Tennessee law prohibits amendments that place additional restrictions on property use.

Start with the grandfather clause. That clause provides in full:

> Any owner engaged in leasing or subleasing activities as of the date of this amendment shall be allowed to continue leasing or subleasing activities *until the expiration of the term of said lease or said lot is sold or conveyed to a third party*. No lease or sublease term extensions are permitted. In order to ascertain the expiration date of current leases, any owner who is leasing as of the date of this Third Amendment shall provide a copy of the lease to the [FSD] Board's secretary within two weeks of the date this Third Amendment is filed with the DeKalb County Register of Deeds' office.

Based on this language, Pandharipande contends that he is allowed to continue renting his property on a short-term basis until his property "is sold or conveyed to a third party," even if the leases that were in place at the time the amendments were executed and recorded have already expired.

We disagree with Pandharipande's reading of this clause. The phrase "is sold or conveyed to a third party" is part of a larger disjunctive phrase: an owner "shall be allowed to continue leasing or subleasing activities until the expiration of the term of said lease *or* said lot is sold or conveyed to a third party." Immediately following this phrase is the sentence, "No lease or sublease term extensions are permitted." This sentence, as well as the ones that follow it requiring the owner to provide copies of any current leases, make clear that the owner's ability to continue leasing or subleasing activities will end when *either* of the two alternatives separated by "or" occurs. It would make no sense to prohibit lease extensions or to require copies of current leases if the owner could, after the expiration of the initial leases, continue leasing the property until it is sold to another party. Pandharipande leases his property for terms of two to twenty-eight days. The term of any

- 18 -

lease in effect when the 2018 amendments were adopted has long since expired. The grandfather clause thus is no help to Pandharipande.

For his second argument, Pandharipande claims that Tennessee law prohibits amendments to restrictive covenants from imposing restrictions greater than those in the original covenants. Because the 1984 covenants do not prohibit short-term leases, he says, neither can the 2018 amendments.

Pandharipande misunderstands Tennessee law. Our precedent instructs that a party is free to purchase property subject to restrictive covenants that allow future amendments, and such amendments generally are permissible unless they are arbitrary and capricious. We have explained that parties to restrictive covenants may "strike their own bargains." *Hughes*, 387 S.W.3d at 475. Thus, "[w]hen a purchaser buys into" a community governed by a restrictive covenant that permits future amendments, "the purchaser buys not only subject to the express covenants in the declaration, but also subject to the amendment provisions of the declaration." *Id.* at 476.

When a homeowners' association or other similar entity amends the existing restrictive covenant, the question is not whether the amendment tightens or loosens existing restrictions, but whether the amendment is "arbitrary and capricious." *Id.* at 478; *see also id.* at 476 (declining to adopt the more stringent "reasonableness" standard embraced by the Court of Appeals and courts in other jurisdictions and observing that "because of the respect Tennessee law affords private contracting parties, we are reticent to inject the courts too deeply into the affairs of a majoritarian association that parties freely choose to enter").[8]

The authorities that Pandharipande cites to support his contrary position are unpersuasive. He relies principally on two unpublished decisions from our Court of Appeals: *Mendelson v. Bornblum*, No. W2004-02549-COA-R3-CV, 2005 WL 1606068 (Tenn. Ct. App. July 8, 2005), and *Conn v. Powell*, 1984 WL 588785 (Tenn. Ct. App. Nov. 5, 1984). In both cases, the Court of Appeals observed that "a provision that any of the restrictions imposed may be modified or amended does not authorize any new or additional restrictions to be imposed, but only authorizes existing restrictions to be made less harsh." *Mendelson*, 2005 WL 1606068, at *6; *Conn*, 1984 WL 588785, at *3.

The *Mendelson* and *Conn* cases, in turn, rely on a section of Corpus Juris Secundum, a treatise that is not binding on this Court. And the particular section of that treatise that Pandharipande cites is unpersuasive. That section, now found at 26A C.J.S. *Deeds* § 427, Westlaw (database updated Aug. 2023), does indeed say that provisions permitting the modification or amendment of a restrictive covenant allow only that existing restrictions be made "less harsh." But the only authority cited to support that assertion is a 1938

---

[8] Restrictive covenants also may be challenged on constitutional grounds. *See Hughes*, 387 S.W.3d at 478, 478 n.20.

decision by the Supreme Court of Missouri: *Van Deusen v. Ruth*, 125 S.W.2d 1 (Mo. 1938). *Van Deusen*, however, provides little support for the unequivocal rule in C.J.S., or for our Court of Appeals' assertion that amendments may only impose "less harsh" restrictions.

*Van Deusen* considered whether a restrictive covenant that permitted future amendments allowed for the imposition of greater restrictions than those found in the original covenant. 125 S.W.2d at 2. The covenant at issue stated that "[a]ll or any of the foregoing provisions or restrictions may be modified, amended, released or extinguished at any time after ten (10) years." *Id.* The court read this language to mean that the parties intended "to permit the existing restrictions to be alleviated, that is, made less harsh, or to be entirely extinguished." *Id.* Its conclusion rested on the particular language of the covenant and did not establish any general principle that amendments can *never* impose additional restrictions. Indeed, the Missouri Supreme Court recently observed that the reasoning in *Van Deusen* was "suspect" and the case should have "no persuasive—let alone binding—force . . . in cases using different language." *Trs. of Clayton Terrace Subdivision v. 6 Clayton Terrace, LLC*, 585 S.W.3d 269, 281–82 (Mo. 2019).

The language at issue here is quite different from that at issue in *Van Deusen*. The 1984 covenants provide that subsequent amendments "may . . . impose, expressly or by reference, additional restrictions and obligations on the land submitted by that Amendment to the provisions of this Declaration." Here, in contrast to *Van Deusen*, the intent of the parties was to allow amendments that impose "additional restrictions and obligations." Pandharipande therefore cannot "be heard to complain when, as anticipated by the recorded declaration of covenants, the homeowners' association amends the declaration" in a manner that further restricts use of his property. *Hughes*, 387 S.W.3d at 476.

Amendments to restrictive covenants are subject to review under the arbitrary-and-capricious standard. "An arbitrary or capricious decision is one that is not based on any course of reasoning or exercise of judgment, or one that disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." *Id.* at 479–80 (citing *City of Memphis v. Civil Serv. Comm'n of Memphis*, 216 S.W.3d 311, 316 (Tenn. 2007)). Where, as here, members of a homeowners' association adopt an amendment, the amendment is presumed valid and the party arguing against the amendment's validity carries the burden of showing that the amendment was arbitrary and capricious. *Id.* at 478 ("For amendments adopted by the association's membership . . . 'we will presume that the restriction is valid and uphold it unless it can be shown that the restriction is arbitrary, against public policy or violates some fundamental constitutional right of the unit owners.'" (quoting *Apple II Condo. Ass'n v. Worth Bank & Tr. Co.*, 659 N.E.2d 93, 99 (Ill. App. Ct. 1995))).

Pandharipande argues that the amendments are arbitrary and capricious because they are impermissibly retroactive. But there is no retroactivity at issue here. Pandharipande purchased his property in 2015. The 2018 amendments were recorded

nearly three years later, and FSD did not attempt to restrict Pandharipande's leasing activity until after the amendments were recorded. FSD seeks only declaratory and injunctive relief and does not seek to impose liability on Pandharipande for past uses of his property. Because FSD is not attempting to apply the 2018 amendments to conduct that occurred before the amendments became effective, Pandharipande's argument regarding retroactivity fails. And because that was the only argument Pandharipande offered in support of his assertion that the 2018 amendments are arbitrary and capricious, he has failed to carry his burden. We therefore hold that the 2018 amendments prohibit Pandharipande's short-term rentals.

## CONCLUSION

We hold that no genuine issues of material fact exist that preclude summary judgment. We further hold that Pandharipande is prohibited from using his property as a short-term rental. Although the 1984 covenants do not prohibit that use, the 2018 amendments to those covenants do. We therefore affirm the Court of Appeals' decision in part, reverse in part, and remand to the trial court for further proceedings consistent with this opinion. Costs of this appeal are taxed to Pandharipande, for which execution may issue, if necessary.

_____
SARAH K. CAMPBELL, JUSTICE